166 P.3d 1198 (2007)
SWINOMISH INDIAN TRIBAL COMMUNITY and Washington Environmental Council, Petitioners,
v.
WESTERN WASHINGTON GROWTH MANAGEMENT HEARINGS BOARD; Skagit County, a municipal corporation of the State of Washington; Skagit County Farm Bureau; Skagitonians to Preserve Farmland; Western Washington *1199 Agricultural Association; Skagit County Diking District No. 3; Skagit County Diking District No. 12; Skagit County Drainage District No. 17; and Skagit County Consolidated Diking District No. 22, Respondents.
Skagit County, a municipal corporation of the State of Washington; Skagit County Farm Bureau; Skagitonians to Preserve Farmland; Western Washington Agricultural Association; Skagit County Diking District No. 3; Skagit County Diking District No. 12; Skagit County Drainage District No. 17; and Skagit County Consolidated Diking District No. 22, Petitioners,
v.
Western Washington Growth Management Hearings Board, Swinomish Indian Tribal Community, and Washington Environmental Council, Respondents.
No. 76339-9.
Supreme Court of Washington, En Banc.
Argued February 7, 2006.
Decided September 13, 2007.
*1201 Alix Foster, Ofc. of Tribal Atty., La Conner, WA, David Alan Bricklin, Bricklin Newman Dold LLP, Seattle, WA, Hilary S. Franz, Hilary S. Franz Attorney at Law, Bainbridge Island, WA, for Petitioners.
Sheila Deirdre Lynch, Ofc. of Attorney General, Martha Patricia Lantz, Offc. of Atty. Gen. Lic. & Admin. Law Div., Larry Dean Stout, Attorney at Law, Olympia, WA, Russell Clayton Brooks, Brian Trevor Hodges, Pacific Legal Foundation, Bellevue, WA, Amanda Jones Johnson, Attorney at Law, La Conner, WA, Gary T. Jones, Jones & Smith, Don Le Roy Anderson, Skagit County Pros. Atty. Office, Mount Vernon, WA, Peter L. Buck, The Buck Law Group, Jay Palmer Derr, Tadas A. Kisielius, Samuel Wilmore Plauche, GordonDerr LLP, Seattle, WA, for Respondents.
Clare Melissa Gilbert, Snohomish County Public Defender's Assoc., Everett, WA, John D. Echeverria, Robert Dreher, Georgetown University Law Center, Washington, DC, for Amicus Curiae on behalf of Washington Trout, Amicus Curiae on behalf of Pacific Coast Federation of Fishermen's Associations, Amicus Curiae on behalf of Institute for Fisheries Resources.
Jason Jerome Cummings, Civil Div. Snohomish County Prosecutor's, Everett, WA, for Amicus Curiae on behalf of Snohomish County.
Toby Thaler, Attorney at Law, Seattle, WA, for Amicus Curiae on behalf of James Karr Ray White Dave Montgomery Kai Lee Stephen Ralph.
Richard Jameson Langabeer, Robert Michael Tull, Langabeer & Tull PS, Bellingham, WA, for Amicus Curiae on behalf of Fish and Farms.
ALEXANDER, C.J.
¶ 1 In this consolidated appeal, we review two separate decisions by the Western Washington Growth Management Hearings Board (Board). Both decisions concern Skagit County's efforts to comply with the critical areas provisions of the Growth Management Act (GMA). In the first decision, Swinomish Indian Tribal Community v. Skagit County, No. 02-2-0012c, 2003 GMHB LEXIS 73 (W. Wash. Growth Mgmt. Hr'gs Bd. (WWGMHB) Dec. 8, 2003) (hereinafter 2003 Compliance Order), the Board largely upheld Skagit County's 2003 effort to comply with the GMA. Approval, however, was subject to two exceptions, "the enforcement of watercourse protection measures and the need for more specificity in [the county's] monitoring program and adaptive management process." Id. at *3. Although the Board's 2003 Compliance Order directed the county to correct the deficiencies within 180 days, it concluded in a *1202 2005 order that the county had failed to do so completely. Swinomish Indian Tribal Cmty. v. Skagit County, No. 02-2-0012c, 2005 GMHB LEXIS 2, at *2-3 (WWGMHB Jan. 13, 2005) (hereinafter 2005 Compliance Order). After review, we uphold both of the Board's decisions.

I. FACTUAL AND PROCEDURAL HISTORY
¶ 2 In 1990, the legislature adopted the GMA, chapter 36.70A RCW. One section of that act, RCW 36.70A.060(2), required local governments to enact development regulations protecting so called "critical areas" by September 1, 1991. "Critical areas" are defined as "(a) Wetlands; (b) areas with a critical recharging effect on aquifers used for potable water; (c) fish and wildlife habitat conservation areas; (d) frequently flooded areas; and (e) geologically hazardous areas." RCW 36.70A.030(5). The requirement to "protect" critical areas is a part of the GMA's larger purpose of requiring comprehensive land use planning within the state of Washington. See RCW 36.70A.020(10) (providing that local governments will "[p]rotect the environment"); RCW 36.70A.010 (describing the legislature's intent in adopting the GMA to provide for "comprehensive land use planning").
¶ 3 The legislature created three regional boards to review compliance with the GMA by the cities and counties that are located within each board's jurisdictional boundaries. See RCW 36.70A.250-.350. One of the boards, the Western Washington Growth Management Hearings Board, is responsible for reviewing Skagit County's compliance with the GMA.
¶ 4 Since 1996, Skagit County has made several efforts to comply with the GMA's critical areas mandate.[1] In 2002, the Board held that the county's then-current critical areas ordinance did not comply with the GMA because there was "no mandatory, fallback approach in place to ensure the protection of CAs [critical areas] and anadromous fish." Swinomish Indian Tribal Cmty. v. Skagit County, No. 02-2-0012c, 2002 GMHB LEXIS 67, at *13 (WWGMHB Dec. 30, 2002). Consequently, the Board ordered the county to "adopt an alternative that . . . must include the adoption of mandatory development regulations for agriculture as necessary to comply with RCW 36.70A.060(2) and .172(1)." Id. Whether Skagit County complied with this directive is the primary issue in this consolidated appeal.
¶ 5 In 2003, following the Board's 2002 finding of noncompliance, Skagit County adopted Ordinance XXXXXXXXX, which contained a "no harm" standard for protecting anadromous fish habitat in agricultural areas. The Swinomish Indian Tribal Community (Tribe) and the Washington Environmental Council (WEC) challenged the ordinance's "no harm" standard, alleging that it failed to protect critical areas, as required by RCW 36.70A.060(2). After reviewing the challenge, the Board upheld the ordinance, concluding that the county was "in compliance with the [GMA] except for the enforcement of watercourse protection measures and the need for more specificity in its monitoring program and adaptive management process." 2003 Compliance Order, 2003 GMHB LEXIS 73, at *3.
¶ 6 The Tribe and the WEC each petitioned the Thurston County Superior Court to review the Board's decision. The petitions were consolidated by the superior court. Thereafter, all three parties (Skagit County, the Tribe, and the WEC) requested, pursuant to the provisions of chapter 34.05 RCW, that the Board certify its decision for direct review by Division Two of the Court of Appeals. The Board agreed that the standard for direct review had been met and, consequently, it granted the motion. Division Two of the Court of Appeals then granted direct review.
*1203 ¶ 7 In 2004, while appellate review was pending, Skagit County adopted Ordinance XXXXXXXXX. It responded to the Board's directions regarding the need for enforcement of watercourse protection measures and greater specificity in its monitoring and adaptive management program. The Tribe and WEC argued to the Board that the 2004 ordinance did not bring the county into full compliance with the GMA. The Board agreed. See 2005 Compliance Order, 2005 GMHB LEXIS 2. The county then petitioned Division Two of the Court of Appeals to directly review the Board's decision, alleging that the Board failed to give proper deference to its interpretation of adaptive management and that the Board used improper procedures in reaching its decision. The Court of Appeals accepted direct review and consolidated the appeal with the pending appeal of the 2003 Compliance Order. We subsequently accepted the Tribe's motion to transfer the consolidated appeal from the Court of Appeals to this court. We now review the decisions of the Board that Skagit County's 2003 Ordinance, with two exceptions, complied with the GMA and its decision that the county's 2004 ordinance did not fully comply with the GMA.

II. STANDARD OF REVIEW
¶ 8 The Board is charged with determining compliance with the GMA and, when necessary, invalidating noncomplying comprehensive plans and development regulations. King County v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd., 142 Wash.2d 543, 552, 14 P.3d 133 (2000) (citing RCW 36.70A.280, .302). The Board "shall find compliance unless it determines that the action by the state agency, county, or city is clearly erroneous in view of the entire record before the board and in light of the goals and requirements of [the GMA]." RCW 36.70A.320(3). An action is "`clearly erroneous'" if the Board is "`left with the firm and definite conviction that a mistake has been committed.'" Cent. Puget Sound Hr'gs Bd., 142 Wash.2d at 552, 14 P.3d 133 (quoting Dep't of Ecology v. Pub. Util. Dist. No. 1, 121 Wash.2d 179, 201, 849 P.2d 646 (1993)). "[C]omprehensive plans and development regulations [under the GMA] are presumed valid upon adoption." RCW 36.70A.320(1). Although RCW 36.70A.3201 requires the Board to give deference to a county, the county's actions must be consistent with the goals and requirements of the GMA. Cent. Puget Sound Hr'gs Bd., 142 Wash.2d at 561, 14 P.3d 133.
¶ 9 This court, in turn, reviews the Board's decisions pursuant to the Administrative Procedure Act (APA), chapter 34.05 RCW. RCW 34.05.570(3). The Board's legal conclusions are reviewed "de novo, giving substantial weight to the Board's interpretation of the statute it administers." Cent. Puget Sound Hr'gs Bd., 142 Wash.2d at 553, 14 P.3d 133. If the Board's findings of fact are reviewed, the substantial evidence test is used. Id.

III. ANALYSIS

A. Background to the 2003 and 2005 Board Decisions
¶ 10 The GMA was enacted largely "`in response to public concerns about rapid population growth and increasing development pressures in the state.'" Quadrant Corp. v. Growth Mgmt. Hr'gs Bd., 154 Wash.2d 224, 232, 110 P.3d 1132 (2005) (internal quotation marks omitted) (quoting Cent. Puget Sound Hr'gs Bd., 142 Wash.2d at 546, 14 P.3d 133). As we have already noted, one of the central requirements of the GMA is that counties and cities, which plan under it, must protect "critical areas." RCW 36.70A.060(2). But the GMA places additional, and sometimes competing, obligations on local governments. For example, it lists as "planning goals" to both "[m]aintain and enhance natural resource-based industries, including productive timber, agricultural, and fisheries industries" and "[e]ncourage the conservation of . . . productive agricultural lands, and discourage incompatible uses." RCW 36.70A.020(8). Local governments are not, however, given much direction by that statute as to whether protection of critical areas or the maintaining of agricultural lands is a priority. In fact, the GMA explicitly eschews establishing priorities: "The [GMA's planning] goals are not listed in order of priority and shall be used *1204 exclusively for the purpose of guiding the development of comprehensive plans and development regulations." RCW 36.70A.020.
¶ 11 The lack of priority in the planning goals becomes especially problematic when local governments are faced with land that qualifies as both agricultural land and as a critical area (for example, a parcel of agricultural land that abuts a water source). Skagit County, in particular, had to confront this tension between maintaining agricultural land and protecting critical areas. This was necessary because the county contains approximately 115,000 acres of agricultural land that have been designated under the GMA as agricultural lands of long-term commercial significance. Furthermore, a significant portion of these lands are located in areas that, although historically part of the Skagit and Samish River deltas and/or floodplains, have been cleared, diked, and drained to make them suitable for agricultural production. Some of this activity occurred as long ago as 100 years. Thus, present day agricultural production in the area depends, in part, upon this network of well established drains and dikes.
¶ 12 At the same time, the State has identified the Skagit and Samish Rivers watershed as the "most significant watershed in Puget Sound" in terms of salmon recovery. Admin. R. (AR) at 4074. It is home to at least six species of salmon and two fish species that are listed under the Endangered Species Act.[2] As the county acknowledges, "[t]he anadromous fish stocks in the Skagit and Samish River systems are another valuable Skagit County natural resource." Resp't Skagit County's Resp. Br. at 9. The resource is also of economic significance because just as farmers depend on agricultural land for their livelihood, persons involved in the fishing industry and belonging to the Tribe depend upon healthy rivers for theirs.
¶ 13 Despite the explicit lack of a prioritization in the planning goals section of the GMA, the legislature has provided some guidance for determining GMA priorities. Specifically, in 1995, the legislature amended the GMA to strengthen protection of critical areas:
In designating and protecting critical areas under this chapter, counties and cities shall include the best available science in developing policies and development regulations to protect the functions and values of critical areas. In addition, counties and cities shall give special consideration to conservation or protection measures necessary to preserve or enhance anadromous fisheries.

RCW 36.70A.172(1) (emphasis added). The GMA was amended again in 1997 to provide that growth management hearings boards should "grant deference to counties and cities in how they plan for growth, consistent with the requirements and goals of this chapter" and that "[l]ocal comprehensive plans and development regulations require counties and cities to balance priorities and options for action in full consideration of local circumstances." RCW 36.70A.3201. But these amendments add little in the way of guidance. For example, the requirements to be guided by the "best available science" (BAS) in developing critical areas regulations and to "give special consideration" to protecting anadromous fisheries arguably conflict with the legislature's directive that growth management hearings boards defer to local balancing of "local circumstances," if that local balancing is not in favor of critical areas. Id. It is with these numerous tensions in mind that we must decide whether Skagit County's critical areas ordinance complies with the GMA.

B. The 2003 Board Decision

1. The "no harm" standard
¶ 14 Riparian farm land in Skagit County qualifies as both "agricultural land" and "critical areas" under the GMA. See RCW 36.70A.030(2), (5). In an effort to "protect" both, consistent with what the GMA requires in RCW 36.70A.020(10), the county's 2003 ordinance established a "no harm" standard that ongoing agricultural operators must *1205 meet. AR at 988 (Skagit County Ordinance XXXXXXXXX, at 78) (hereinafter 2003 Ordinance). Under the 2003 Ordinance, farmers are to conduct ongoing agricultural activities "so as not to cause harm or degradation to the existing Functional Values" of critical areas. Id. In effect, the county's no harm standard sets the "existing" condition of local critical areas as the baseline for measuring harm. Id. The county contended before the Board that the no harm standard protects critical areas in a manner consistent with the GMA. The Board largely agreed with the county.
¶ 15 At the core of the Board's decision was its interpretation of the word "protect," as it appears in RCW 36.70A.172(1). The Board held that the requirement under the GMA to "protect" critical areas is met when local governments prevent new harm to critical areas. See 2003 Compliance Order, 2003 GMHB LEXIS 73, at *7-9. Accordingly, it held that the county protects these areas by adopting the no harm standard because it does not allow existing conditions to further degrade. See id.
¶ 16 The Tribe asserts here, as it did before the Board, that where an area is already in a degraded condition, it is not being protected unless that condition is improved or enhanced.[3] It contends that the Board's "construction of `protect' to allow maintenance of degraded, status quo conditions nullifies the legislature's direction to `protect the functions and values of critical areas.'" Am. Br. of Swinomish Indian Tribal Cmty. at 38.
¶ 17 The Board's refusal to conflate "protect" and "enhance," the Tribe asserts, "is based on a false premise  that `protect' and `enhance' are mutually exclusive." Am. Br. of Swinomish Indian Tribal Cmty. at 39. The Tribe argues that because the terms are not mutually exclusive, the Board cannot "exclude from the `protect' mandate measures which both `protect' and `enhance.'" Am. Br. of Swinomish Indian Tribal Cmty. at 42.
¶ 18 In our effort to determine if the Board erred, we have endeavored to ascertain the meaning of the word "protect." The legislature, unfortunately, has not defined "protect" within the GMA. We therefore accord the word its common meaning, and where necessary, consult a dictionary. See Quadrant Corp., 154 Wash.2d at 239, 110 P.3d 1132 (citing Dahl-Smyth, Inc. v. City of Walla Walla, 148 Wash.2d 835, 842-43, 64 P.3d 15 (2003)). The Tribe cites Webster's New World Dictionary of the American Language (College Ed.1966) in support of its contention that "`protect'" means "`to shield from injury, danger, or loss'" and that to protect "`can result in [an object's] enhancement.'" Am. Br. of Swinomish Indian Tribal Cmty. at 39 (emphasis added). The Tribe, however, fails to recognize that even under the definition it offers, "can" is used to describe an option of enhancement, rather than a requirement of enhancement, when defining "protect."
¶ 19 That difference is significant. We say that because it illustrates that something can be protected without it being enhanced. For example, an individual charged with protecting his friend's dilapidated automobile discharges that duty despite not refurbishing it. If the car is returned in its same condition, it was protected, but not enhanced.[4]
¶ 20 The legislature has also recognized that "protect" has a different meaning than "enhance." In several sections of the GMA, the legislature allows enhancement of natural *1206 conditions under the GMA without requiring enhancement. For example, RCW 36.70A.172(1) requires counties to "give special consideration to . . . protection measures necessary to preserve or enhance anadromous fisheries." (Emphasis added.) This statute clearly gives counties a choice between preserving "or" enhancing. Furthermore, the requirement is to give "special consideration to" such measures, not necessarily to adopt them. See WAC 365-195-925(2) (a county must include "in the record" evidence of special consideration to comply with RCW 36.70A.172(1)). Another statute, RCW 36.70A.020(10), lists as a goal of the GMA to "enhance the state's high quality of life, including air and water quality." However, the GMA allows counties to decide how to achieve the goal of enhancing water quality without specifically requiring enhancement of a damaged fish habitat. In our judgment, water quality and fish habitat are related, but they are not the same. A duty to enhance the quality of water is not a duty to enhance fish habitat. A third example is RCW 36.70A.460. It recognizes that under chapter 77.55 RCW, fish habitat enhancement projects that meet certain criteria are entitled to a streamlined permitting process. Nothing in that chapter, however, requires a county to undertake such projects. See RCW 77.55.181.
¶ 21 As the foregoing illustrates, the legislature has not imposed a duty on local governments to enhance critical areas, although it does permit it. Without firm instruction from the legislature to require enhancement of critical areas, we will not impose such a duty. Therefore, to the extent that the Tribe argues that the GMA places a higher burden upon the county than the duty to prevent new harm to critical areas, we disagree. The "no harm" standard, in short, protects critical areas by maintaining existing conditions.

2. Mandatory Buffers
¶ 22 We next consider whether, as the Tribe contends, the GMA requires the county to establish mandatory buffers along streams and rivers on the upland strip of land. Buffers are strips of land contiguous to a watercourse, usually containing indigenous shrubs and trees. They are generally not used for agricultural purposes. See, e.g., Am. Br. of Swinomish Indian Tribal Cmty. at 5-6. The Tribe argued to the Board that because a provision of the GMA, RCW 36.70A. 172(1), requires the county to use BAS in developing protections for critical areas and because BAS supports requiring mandatory riparian buffers, then the GMA requires the county to establish such buffers. The Board held that BAS, and by extension the GMA, does not require the county to establish mandatory riparian buffers. Again, we agree with the Board.
¶ 23 In reaching this determination, we began by reviewing how the GMA instructs local governments to employ BAS. The legislature has expressly delegated to counties and cities the function of developing the specific means for protecting critical areas. See RCW 36.70A.3201. Under the GMA, counties and cities "`have broad discretion in developing . . . [development regulations] tailored to local circumstances.'" King County, 142 Wash.2d at 561, 14 P.3d 133 (alteration in original) (quoting Diehl v. Mason County, 94 Wash.App. 645, 651, 972 P.2d 543 (1999)). Moreover, the GMA does not require the county to follow BAS; rather, it is required to "include" BAS in its record. RCW 36.70A.172(1). Thus, the county may depart from BAS if it provides a reasoned justification for such a departure. See Ferry County v. Concerned Friends, 155 Wash.2d 824, 837-38, 123 P.3d 102 (2005); WAC 365-195-915(1)(c)(i)-(iii). Here, the county justified its decision to not require mandatory riparian buffers on the basis that doing so would "impos[e] requirements to restore habitat functions and values that no longer exist." Resp't Skagit County's Resp. Br. at 44. This was based on a recognition of the fact that the vegetation that had made up the riparian buffers along streams and rivers was cleared long before there was a legal impediment to doing so.
¶ 24 If the omission of mandatory buffers from the county's critical areas ordinance is a departure from BAS, it is a justified departure of the kind that is tolerated by the GMA. As we have noted above, the GMA's *1207 requirement to protect does not impose a corresponding requirement to enhance. That holding guides us here. A requirement to develop buffers would impose an obligation on farmers to replant areas that were lawfully cleared in the past, which is the equivalent of enhancement. Without a duty to enhance being imposed by the GMA, however, we cannot require farmers within Skagit County to replant what was long ago plucked up. The county need not impose a requirement that farmers establish riparian buffers.

C. The 2005 Board Decision
¶ 25 As we observed above, the Board did not fully approve the 2003 Ordinance. It withheld its approval of two parts of the ordinance: "the enforcement of watercourse protection measures and the need for more specificity in its monitoring program and adaptive management process." 2003 Compliance Order, 2003 GMHB LEXIS 73, at *3. Furthermore, the Board ordered the county to address these issues in accord with RCW 26.70A.300(1). Consequently, as we have already noted, the county revised its critical areas ordinance in 2004 (Ordinance XXXXXXXXX) (hereinafter 2004 Ordinance). The Tribe again challenged the county's compliance with the GMA. After reviewing the county's effort, the Board held in early 2005 that the watercourse protection measures were now compliant with the GMA.2005 Compliance Order, 2005 GMHB LEXIS 2. It withheld approval, however, of the monitoring program and adaptive management sections of the 2004 Ordinance. The county appealed that decision, arguing that the Board followed improper procedure in reaching its decision and that, in any case, the Board should have approved the revised ordinance.

1. Alleged Procedural Errors
¶ 26 The county argues, first, that the Board committed procedural error by consulting an outside expert and consulting factual materials that were not a part of the record that was submitted to the Board. Specifically, it asserts that the Board erred in using a technical adviser, Dr. Oscar Soule,[5] without giving the parties an opportunity to rebut or object to the technical advice provided by Dr. Soule. This argument overlooks the fact that the Board is expressly authorized to consult experts "[i]f it determines that advice from scientific or other experts is necessary or will be of substantial assistance in reaching its decision." RCW 36.70A.172(2).[6] While the GMA provides no specific procedure for the utilization of an expert under RCW 36.70A.172(2), the practices and procedures of the growth management hearings board are governed by the APA, chapter 34.05 RCW. RCW 36.70A.270(7). A provision in the APA permits the Board to engage in ex parte communications with persons "who have not participated in the proceeding in any manner, and who are not engaged in any investigative or prosecutorial functions in the same or a factually related case." RCW 34.05.455(1)(c). Accordingly, we conclude that the Board did not err in consulting Dr. Soule.
¶ 27 The county claims, additionally, that the Board erred in using nonrecord materials to define the concept of "adaptive *1208 management."[7] The county argues that the Board is prohibited from consulting nonrecord materials because "`[f]indings of fact shall be based exclusively on the evidence of record in the adjudicative proceeding and on matters officially noticed in that proceeding.'" Skagit County's Opening Br. at 38 (emphasis added) (quoting RCW 34.05.461(4)). In our view, the Board did not err in considering these nonrecord materials because the materials were not evidence. Rather, the Board used the publications to assist in interpreting the term "adaptive management" as used in WAC 365-195-920(2). See 2005 Compliance Order, 2005 GMHB LEXIS 2, at *21-22. Such use of scholarly materials does not, in our view, transform these materials into "evidence." In sum, the Board's use of the nonrecord materials to aid it in defining the term "adaptive management" did not violate the APA or the GMA.

2. Alleged Substantive Errors
¶ 28 We next address the county's substantive challenges to the Board's 2005 decision. The Board determined that the county's revised ordinance failed to bring its monitoring and adaptive management processes into compliance with the GMA. It concluded that the monitoring process provided for in the 2004 Ordinance lacked the necessary benchmarks for comparing the data it gathered. 2005 Compliance Order, 2005 GMHB LEXIS 2, at *25-26. The Board concluded, additionally, that even if the monitoring process was adequate in detecting degradation of critical areas, the ordinance did not have an effective adaptive management process that was capable of responding to the detected harm. Id. at *32-33.
¶ 29 The monitoring program set forth in the 2004 Ordinance consists of two components: a water quality monitoring program and a salmon habitat monitoring program. The county contends that both programs "describe in great detail the schedule for monitoring, methods for selecting sites, monitoring parameters and protocols (how and what will be measured), quality control procedures, and data assessment procedures." Skagit County's Opening Br. at 13. This contention overlooks the fact that the Board took issue with how the county proposed to use the data it collected. More specifically, the Board held that the county could not sufficiently analyze the data because its monitoring program lacked appropriate benchmarks to compare data as it was collected. See 2005 Compliance Order, 2005 GMHB LEXIS 2, at *25-26.
¶ 30 We agree with the Board that the county has not established appropriate benchmarks. In fact, the county is unable to produce a description of any such benchmarks, despite its statement that "the County's program does include sufficient benchmarks." Skagit County's Opening Br. at 50. That same brief contains an assertion by the county that it cannot adopt benchmarks because salmon habitat monitoring program "science has not established[,] and the state has not adopted[,] specific numbers or quantities" to use as benchmarks. Id. at 54. Any deficiencies in the State's monitoring process do not, however, excuse the deficiencies of the county's monitoring process. A benchmark is needed to compare data as it is recorded. Data that cannot be analyzed, via comparison to the benchmark, is essentially meaningless because a harm cannot be detected unless there is a benchmark by which to define a harm in the first place.
¶ 31 We are also unpersuaded by the county's argument that in the absence of *1209 an adequate benchmark, it does the "next best thing" by proposing to monitor current conditions in an effort to develop a benchmark in the future. Skagit County's Opening Br. at 56. No indication is given as to when this process will be complete. Instead, the county merely notes that it will take at least three years to complete the initial monitoring of current conditions before a benchmark is established. Id. At best, then, the county can provide full compliance with the GMA three years after it went before the Board and argued that it was compliant. We find no reason to reverse the Board's holding that such an assurance by the county is insufficient.[8]
¶ 32 The issue of the benchmarks in the monitoring program dovetails into what the role of adaptive management is in the protection of critical areas. When a monitoring system detects newly discovered risks to critical areas from land use or development, adaptive management is a process used to confront the scientific uncertainty surrounding them. WAC 365-195-920. As part of the GMA's regulations describe it, critical areas regulations are "treated as experiments that are purposefully monitored and evaluated to determine whether they are effective and, if not, how they should be improved to increase their effectiveness." WAC 365-195-920(2). An effective adaptive management program thus "relies on scientific methods to evaluate how well regulatory and nonregulatory actions achieve their objectives." Id. In short, under GMA regulations, local governments must either be certain that their critical areas regulations will prevent harm or be prepared to recognize and respond effectively to any unforeseen harm that arises. In this respect, adaptive management is the second part of the process initiated by adequate monitoring.
¶ 33 In its 2005 Compliance Order, the Board did not approve the county's adaptive management program.[9] It noted that "clear goals, objectives, performance standards, and a well-defined monitoring program" are essential to a successful adaptive management program and that the county did not demonstrate them. AR at 1312-13. Because we agree with the Board that the monitoring system set forth in the 2005 Ordinance by the county is fatally flawed, we need not reach the question of whether its adaptive management system complies with the GMA. Without a compliant monitoring system, the adaptive management program cannot be compliant as the county cannot adequately adapt its management of critical areas if it is unable to adequately detect changes to them.

IV. CONCLUSION
¶ 34 In sum, we affirm the Board's 2003 and 2005 Compliance Orders.
WE CONCUR: CHARLES W. JOHNSON, TOM CHAMBERS, BARBARA A. MADSEN, MARY E. FAIRHURST, and BOBBE J. BRIDGE, Justices.
*1210 J.M. JOHNSON, J. (concurring in part and dissenting in part).
¶ 35 I join the majority to affirm the Western Washington Growth Management Hearings Board (Board) 2003 order upholding Skagit County's (County) comprehensive plan under the Growth Management Act (GMA). However, I write separately because I would reverse the inconsistent 2005 Board order that determined that the County's adaptive management processes under the affirmed comprehensive plan failed to comply with the GMA.
¶ 36 The majority's decision that the legislature did not intend "protection" to further mandate enhancement is a correct reading of the statute and properly deferential to the County's plan as also required by the statute. In dissent, I assert the same deference should apply to the County's adaptive management program. In addition, the 2005 Board decision was flawed by consultation with an ex parte technical adviser, and improperly relied on nonrecord materials.
¶ 37 While I concur with the chief justice's affirmation of the 2003 Board order and the county plan, I address the important legal defects in the Board's 2005 order.
Growth Management Hearings Boards Have Limited Discretion
¶ 38 The GMA provides for the creation of three regional growth management hearings boards to resolve some planning disputes under the statute. RCW 36.70A.250. The growth management hearings board members are not elected but are appointed by the governor for six-year terms (without legislative confirmation). RCW 36.70A.260. They do not have, indeed cannot have, legislative power over land use. It follows that they surely have no power to engage in the "adaptive management" of county lands.
¶ 39 The legislature has expressly required each growth management hearings board "to grant deference to counties and cities in how they plan for growth, consistent with the requirements and goals of" the GMA. RCW 36.70A.3201. Growth management hearings boards are limited in jurisdiction, possessing no policy-making authority. See Viking Props., Inc. v. Holm, 155 Wash.2d 112, 129, 118 P.3d 322 (2005).[1] The GMA does not require a single approach to growth management or to adaptive growth management. See id. at 125-26, 118 P.3d 322 (alteration in original) ("`the ultimate burden and responsibility for planning, harmonizing the planning goals of [the GMA], and implementing a county's or city's future rests with that community'" (quoting RCW 36.70A.3201)).
¶ 40 Under the GMA, the legislature requires that when a growth management hearings board considers challenges to the decisions of local government it "shall find compliance unless it determines that the action by the state agency, county, or city is clearly erroneous in view of the entire record before the board and in light of the goals and requirements of this chapter." RCW 36.70A.320(3) (emphasis added). Accordingly, "a board's ruling that fails to apply this `more deferential standard of review' to a county's action is not entitled to deference from this court." Quadrant Corp. v. Hearings Bd., 154 Wash.2d 224, 238, 110 P.3d 1132 (2005). As the analysis provided below demonstrates, the Board's 2005 order fails to accord the County the statutorily required deference. Accordingly, I would not defer to the Board's 2005 order.
The County's Adaptive Enforcement Mechanism Satisfies the GMA
¶ 41 We begin with the Board's inconsistent decisions to uphold the County's comprehensive plan, but we challenge its adaptive management process. The County's program consists of two adaptive mechanisms: a water quality monitoring program (WQMP) and a salmon habitat monitoring program (SHMP). The WQMP measures water quality parameters and their importance to fish habitat. The methods and protocols *1211 are derived from guidelines created by state and federal agencies, including the United States Environmental Protection Agency (EPA), the Washington State Department of Ecology (Ecology), and the U.S. Geological Survey. Admin. R. (AR) at 0109-110. The SHMP is based on EPA standards and was developed with the assistance of scientists from the EPA. See, e.g., AR at 0082-83; AR at 0532-602; AR at 0604-877; AR at 0891-904; AR at 0897-98.
¶ 42 Likewise, the County's adaptive management program specifies statistical methods for reporting and analyzing data collected, requiring publication of an annual report and the raw data. See, e.g., AR at 0071; AR at 0094; AR at 0105-108. The program even includes a minimum three-year cycle legislative process for the County to consult with agencies and then consider proposals to amend a county ordinance (if the County decides that the desired protection level has not been achieved). AR at 0105-106. It is notable that the County's three-year cycle is significantly shorter than the seven-year time period specified by the GMA. See RCW 36.70A.130(4)(b).
¶ 43 The majority argues that the County's plan lacks evidence of sufficient benchmarks. Majority at 1208. This is an inconsistent position, given the majority's decision that "protection" does not require enhancement over and beyond the current fish run status. Here, the County's monitoring and adaptive management programs were created in consultation with both state and federal agencies with expertise, including the Washington Department of Fish and Wildlife, Ecology, and the EPA. See AR at 0891-905; AR at 0527-30; AR at 0959-60; AR at 0931-58; AR at 0906-30. Strikingly, the County's final decisions were supported by Ecology and the EPA. AR at 0525; AR at 0970. Thus, the County's program is consistent with state and federal programs and has been tailoredwith the assistance of those respective agenciesto the County's local circumstances. Id. Due diligence has been satisfied, as has RCW 36.70A.172(1)'s requirement that the County include the "best available science in developing policies and development regulations to protect the functions and values of critical areas."
¶ 44 This court's recent decision in Ferry County v. Concerned Friends, 155 Wash.2d 824, 123 P.3d 102 (2005), did not determine whether the best available science (BAS) requirement is procedural or substantive in character. I pointed out as much in my dissent. Id. at 855, 123 P.3d 102 (Johnson, J.M., J. dissenting). In my view, the BAS requirement is best understood as a procedural mandate requiring consideration of "best available science" by local government, but continuing the deference to local decisions made after such consideration. As a procedural matter, the County's determination in this matter clearly satisfied the BAS requirement. This conclusion is confirmed by the participation in and approval of the county plan by federal and state environmental agencies.
¶ 45 The majority asserts that the three-year window set aside for data collection is insufficient, precisely because the data has not yet been collected. Majority at 1208. However, the County should not be penalized for adopting this three-year practice that is actually more protective than the GMA mandated seven-year review cycle. See RCW 36.70A.130(4)(b).
¶ 46 Additionally, the criticized three-year period for the collection of benchmark data is now moot. By the time this opinion issues, the benchmark data promised by the County will be available since this case concerns 2003-04 events. Yet, the majority argues that the Board should not approve the County's plan without sufficient data collection measures in place. Majority at 1208. This argument does not give the statutorily required deference to the County; indeed, it casts aspersions on the County's assurances. Id. ("We find no reason to reverse the Board's holding that such an assurance is insufficient."). The County had a plan to generate benchmark numbers but needed time to establish the comparative values. See Skagit County's Opening Br. at 56. The Board should not overturn the County's plan because it had not yet yielded results. Ironically, the results were not complete, precisely *1212 because the Board refused to allow implementation of the County's plan.
¶ 47 In sum, if there is a plausible argument that some other enforcement mechanism might further the goals of the GMA, such as revised benchmarks, the County is free to consider any such proposal.[2] The Board or a court may not make that decision for the County because neither possesses legislative powers. The county standards satisfy statutory requirements and common sense, and this court should do "no harm" to the GMA's hallmark of local decision making. See Quadrant, 154 Wash.2d at 238, 110 P.3d 1132.
¶ 48 Here, the County's actions must be implemented by ordinances that utilize an open, deliberative process involving notice and public discussion. See RCW 36.70A.035; see also RCW 42.30.030 ("All meetings of the governing body of a public agency shall be open and public and all persons shall be permitted to attend any meeting of the governing body of a public agency. . . ."). This process protects the interests of all stakeholders by encouraging a fully developed public record. The various interested parties should be required to submit their recommendations and then allow the County to revise its management program through the appropriate deliberative and local legislative process.
Defects of the Board's 2005 Order
¶ 49 The Board's 2005 order is the product of procedural defects that separately require reversal. The Board's reliance upon nonrecord materials constitutes a denial of proper procedures. Likewise, its reliance upon a secret "expert" to support the 2005 order did not adhere to common law principles of notice and verification. I recognize that a governmental entity does not have actual due process rights, as those rights are properly reserved for private parties. See City of Mountlake Terrace v. Wilson, 15 Wash.App. 392, 394, 549 P.2d 497 (1976). However, the Board's conduct in this matter violates the same core common law principles that support the due process doctrine: openness and fair play. The rationale for open and balanced proceedings is spelled out in the Administrative Procedure Act (APA), chapter 34.05 RCW, the GMA, and growth management hearings boards procedures. These sources of authority embody fundamental principles of fairness that entitle parties to notice and the opportunity to respond to materials used against them in Board proceedings and decisions. Improper procedures are also grounds for reversal. See RCW 36.70A.290(4); WAC 242-02-540. See also RCW 36.70A.270(7); RCW 34.05.449(2), 452(3).
¶ 50 First, this Board based its analysis and conclusion largely upon four nonrecord documents. None of those publications were presented to the County or were part of the record. The Board did not notify the County before or during the hearing that it intended to rely on those publications. Nor did the Board afford the County opportunity to respond to the facts and assertions upon which it ultimately based its decision.
¶ 51 The majority contends that these distinctions are not dispositive because the mere use of such materials is not sufficient to transform the publications into evidence. Majority at 1208. I disagree. The Board relied on the publications to inform its working definition of "adaptive management"; a key term used in the Board's final decision. These secondary sources should have been available for scrutiny because a successful challenge to their credibility or relevance would have seriously undermined the Board's final determination.[3] One could reasonably assume that the sources analyses of conditions in other states (and counties) were *1213 much less relevant than the state and local experts who participated on behalf of the County.[4] Second, the Board engaged an ex parte scientific consultant to review its draft decision and opine on the nonrecord sources it cited. Without notifying the parties, the Board procured the opinion of a retired environmental science professor, Oscar H. Soule, Ph.D.[5] It belatedly issued a "Notice of Consultation" when it was too late to object or qualify the professor as a "consultant." AR at 1328-46; see also supra note 4. The Board rejected all parties' requests that it refrain from consulting this expert without appropriate notice.
¶ 52 RCW 36.70A.172(2) does authorize growth management hearings boards to retain scientific advice or experts to assist in reviewing petitions involving critical areas. The GMA does not, however, specify procedures for the Board to do so. Here, APA provisions govern the Board's conduct except where they conflict with specific GMA provisions. RCW 36.70A.270(7). The majority notes that RCW 34.05.455(1)(c) allows for ex parte communication with other employees or consultants of the agency "`who have not participated in the proceeding in any manner.'" Majority at 1207 (quoting RCW 34.05.455(1)(c)). However, a Board cannot arbitrarily rely on undisclosed and unqualified opinions. Here, the record does not establish that Dr. Soule met any statutory exception. Instead, the County and the tribe were denied the ability to review Dr. Soule's "consultant" qualifications (or lack thereof) and cross-examine him concerning background, publications, and experience.[6]
¶ 53 In sum, Dr. Soule's conclusion that the nonrecord sources contradicting the county plan "represent sound science," does not equate to the GMA's more stringent BAS standard. The Board is clearly trying to bootstrap the "sound science" used by Dr. Soule into the BAS standard, a category that is properly limited to the best of all available "sound science" and by definition is an exclusive, rather than inclusive term. In view of the Board's failure to engage in an open process, its reliance upon this nonrecord "sound science" also requires reversal. Equally important, these several improper bases for the Board's second order, especially its reliance on extra record materials, hamper meaningful judicial review.

Conclusion
¶ 54 In accord with the majority, I agree to affirm the Board's 2003 order upholding the County's comprehensive plan. Thus, I concur. However, I would reverse the Board's 2005 order concerning Skagit County's adaptive management regulations. I would remand this case to the Board and instruct the Board to remand immediately back to Skagit County. More than three years has transpired since the commencement of this action, and I would accept the County's assurances that it will apply its process, including the benchmark provision, in good faith. The statutorily required deference should allow the County to implement its adaptive management while considering input from all interested parties.
WE CONCUR: RICHARD B. SANDERS, Justice.
OWENS, J. (dissenting).
¶ 55 The majority affirms the Western Washington Growth Management Hearings Board's (Board) finding that Skagit County's "no harm" standard establishes an appropriate baseline for protecting critical areas within *1214 agricultural areas of long-term commercial significance. Under this standard, farmers must ensure that their agricultural practices do not cause further substantial harm to the present degraded conditions of the riparian fish and wildlife habitat. Because I read the Growth Management Act (GMA), chapter 36.70A RCW, as requiring enhancement under certain circumstances where existing conditions are degraded and cannot adequately support anadromous fisheries, I would hold the "no harm" standard fails to satisfy the GMA's mandate to "adopt development regulations that protect critical areas." RCW 36.70A.060(2). Thus, I respectfully dissent.
¶ 56 The legislature adopted the GMA after finding that "uncoordinated and unplanned growth, together with a lack of common goals expressing the public's interest in the conservation and the wise use of our lands, pose a threat to the environment, sustainable economic development, and the health, safety, and high quality of life enjoyed by residents of this state." RCW 36.70A.010. Among others, the legislature listed the following planning goals: "[m]aintain and enhance natural resource-based industries, including productive timber, agricultural, and fisheries industries," "[e]ncourage the conservation of . . . productive agricultural lands," "conserve fish and wildlife habitat," and "[p]rotect the environment and enhance the state's high quality of life, including air and water quality." RCW 36.70A.020(8), (9), (10). To accomplish these goals, the GMA specifically requires local jurisdictions to "adopt development regulations that protect critical areas." RCW 36.70A.060(2). "`Critical areas'" include "fish and wildlife habitat conservation areas." RCW 36.70A.030(5)(c). In designating and protecting critical areas, the GMA directs local jurisdictions to "include the best available science" and "give special consideration to conservation or protection measures necessary to preserve or enhance anadromous fisheries." RCW 36.70A.172(1).
¶ 57 Pursuant to the GMA's mandate to protect critical areas, Skagit County adopted an ordinance governing the protection of anadromous fish habitat within agricultural areas of long-term commercial significance. This ordinance includes minimal protective regulations and an adaptive management program aimed at protecting the existing functions and values of the fish and wildlife habitat. In particular, this ordinance requires "no evidence of significant degradation to the existing fish habitat characteristics of the watercourse" and mandates compliance with state water quality standards, total maximum daily load requirements, the state hydraulics code, and specified watercourse protection measures. Skagit County Ordinance XXXXXXXXX(3)(a)(v), (i)-(iv) (codified at Skagit County Mun.Code 14.24.120(3)(a)(v), (i)-(iv)). In reviewing whether this ordinance complies with the GMA, the Board deemed that the combination of minimal protective regulations, namely the "no harm" standard, and the adaptive management program, which detects habitat deterioration, in theory, provides adequate protection for the critical areas. However, the Board found that Skagit County failed to establish benchmarks and implement triggers for corrective action, which are necessary for identifying deterioration and responding effectively with protective measures.
¶ 58 The majority affirms the Board's decision, holding the "no harm" standard adequate if combined with a functional program for adaptive management. The majority's interpretation, however, conflicts with the legislature's broad protection mandate for critical areas, particularly with respect to fish and wildlife habitat supporting anadromous fisheries. The legislature specifically directed local jurisdictions to "give special consideration to conservation or protection measures necessary to preserve or enhance anadromous fisheries." RCW 36.70A.172(1) (emphasis added).
¶ 59 In implementing this legislation, the Department of Community, Trade, and Economic Development (CTED) promulgated rules to explain the criteria for determining whether local jurisdictions gave adequate "special consideration" to conservation or protection measures under RCW 36.70A.172(1). In this regulation, CTED clarifies that conservation or protection *1215 measures "include measures that protect habitat important for all life stages of anadromous fish, including, but not limited to, spawning and incubation, juvenile rearing and adult residence, juvenile migration downstream to the sea, and adult migration upstream to spawning areas." WAC 365-195-925(3). CTED further explains that local jurisdictions must consider "the best available science relevant to stream flows, water quality and temperature, spawning substrates, instream structural diversity, migratory access, estuary and nearshore marine habitat quality, and the maintenance of salmon prey species." Id. These measures "can include the adoption of interim actions and long-term strategies to protect and enhance fisheries resources." Id.
¶ 60 Nothing in the critical areas statute or its implementing regulations indicates that the legislature deemed the existing degraded conditions adequate to protect salmon habitat. To the contrary, the regulations demonstrate that preserving and enhancing fish and wildlife habitat to support salmon fisheries requires the implementation of complicated measures. Moreover, the legislature anticipated that protecting these critical areas may entail development regulations that change, modify, or stop existing legal practices. For example, the legislature specifically qualified its mandate to protect agricultural, forest, and mineral resource lands with a prohibition on regulations that interfere with preexisting legal uses. RCW 36.70A.060(1)(a). The legislature specifically did not include a similar provision in its mandate to protect critical areas, RCW 36.70A.060(2); in fact, the legislature removed the provision from the bill before enacting it. See H.B. Final Rep. on Engrossed Substitute H.B. 1025, at 3, 52d Leg., 1st Spec. Sess. (Wash.1991). By omitting language that would prohibit regulations that restrict preexisting legal uses in critical areas under RCW 36.70A.060(2), the legislature demonstrated its intent for local jurisdictions to enact robust protection measures as necessary to ensure the continued viability of critical areas.
¶ 61 In addition to undermining the legislature's intent to provide broad protection for fish and wildlife habitat, the majority's holding relies on flawed reasoning. The majority observes that the legislature did not explicitly define "protect" in the GMA. After examining the dictionary, and the legislature's use of the term "protect" in other statutory provisions, the majority reasons that "something can be protected without it being enhanced." Majority at 1205. Thus, according to the majority, enhancement is never a necessary component of protection. From this logic, the majority deduces that maintenance of the existing conditions always protects the fish and wildlife habitat, even where the conditions are presently degraded. Id. at 1205-06. I disagree. The fact that protection does not always require enhancement does not mean that protection never requires enhancement. Whether protection requires enhancement depends on the condition of the object to be protected. Where the conditions of the fish and wildlife habitat are degraded and thereby unable to support the anadromous fisheries, protection may require some level of enhancement.
¶ 62 The majority's analogy to a dilapidated automobile is similarly unavailing. The majority explains that "an individual charged with protecting his friend's dilapidated automobile discharges that duty despite not refurbishing it. If the car is returned in its same condition, it was protected, but not enhanced." Id. at 1205. Contrary to the majority's implication, the individual's failure to enhance the car does not necessarily mean that he fulfilled his duty to protect the car. The majority provides no support to show how the car "was protected," except that it "[was] not enhanced." This analogy fails to recognize that depending on the circumstances, the individual would have had to do something in order to protect the car; in an unsafe neighborhood, this may have involved locking the doors or parking in a garage, and in flooded conditions, this may have involved moving the car to another street. Simply returning it in the same condition does not demonstrate how the individual protected it; rather, it shows only that the individual returned it without refurbishing it. In a similar fashion, the majority provides no support for its determination that Skagit County's "no harm" standard "protects" the fish and *1216 wildlife habitat, except by showing that the standard does not enhance the habitat.[1]
¶ 63 Although the majority recognizes that protection may result in enhancement, it holds that enhancement is an option, never a requirement. This conclusion ignores the legislature's intent to provide genuine protection for fish and wildlife habitat critical areas supporting anadromous fisheries. Rather than assuming that existing conditions provide adequate protection, I would hold that the conditions of the salmon habitat dictate whether the local jurisdiction should employ preservation or enhancement measures. While I agree with the majority's ultimate conclusion that Skagit County failed to establish baselines and implement an adequate monitoring system to protect the salmon habitat, I also believe that Skagit County failed to show that the "no harm" approach of maintaining existing conditions meets the GMA's directive. Contrary to the majority's position, I read the GMA to require that local jurisdictions take action to protect salmon fisheries; depending on the existing conditions, protection may entail preservation or enhancement. If the conditions are "dilapidated," then merely maintaining them does not provide the protection the GMA requires.
NOTES
[1] See, e.g., Friends of Skagit County v. Skagit County, Nos. 96-2-0025 & 00-2-0033c, 2001 GMHB LEXIS 53 (WWGMHB Feb. 9, 2001); Friends of Skagit County v. Skagit County, Nos. 96-2-0025 & 00-2-0033c, 2000 GMHB LEXIS 323 (WWGMHB Aug. 9, 2000); Friends of Skagit County v. Skagit County, No. 96-2-0025, 1998 GMHB LEXIS 283 (WWGMHB Sept. 16, 1998); Friends of Skagit County v. Skagit County, No. 96-2-0025, 1997 GMHB LEXIS 344 (WWGMHB Jan. 3, 1997).
[2] Endangered and Threatened Wildlife and Plants, 64 Fed.Reg. 58,910 (Nov. 1, 1999) (Coastal-Puget Sound Bull Trout); Endangered and Threatened Species, 64 Fed.Reg. 14,308 (Mar. 24, 1999) (Puget Sound Chinook).
[3] For purposes of simplicity, we discuss similar positions and arguments that are put forward separately by the Tribe and the WEC by referring only to the first party, the Tribe. For example, both the Tribe and the WEC challenge the no harm standard in the 2003 Ordinance, but we refer to it as the Tribe's position.
[4] The dissent attempts to buttress its position that "protect" entails "enhance" by asserting that the automobile analogy is "unavailing." Dissent at 1211. It concludes, "[s]imply returning [the automobile] in the same condition does not demonstrate how the individual protected it; rather, it shows only that the individual returned it." Id. The dissent, in our view, confuses the question of how an object is protected with the question of whether it was protected. Because this case turns upon what "protect" means, it is the latter question that is determinative. Asking how the object was protected is secondary. To answer the relevant question of whether an object has been protected: If it is returned in the same condition it was given, surely no new harm has befallen it and it was protected. This is true by definition.
[5] Dr. Soule is a retired professor of environmental studies at The Evergreen State College.
[6] The concurrence/dissent cites various statutes and a regulation in support of its conclusion that "[i]mproper procedures [i.e., reliance on Dr. Soule] are also grounds for reversal." Concurrence/dissent at 1212 (citing RCW 36.70A.290(4), .270(7); RCW 34 .05.449(2), .452(3); WAC 242-02-540). None of the cited statutes or the regulation provides justification for reversing the Board's decision. Furthermore, they do not override the clear authorization for ex parte consultation with experts that RCW 36.70A.172(2) and 34 .05.455(1)(c) provide. For example, RCW 36.70A.270(7) directs the Board to comply with the APA and WAC provisions for using evidence in its decisions. Those provisions, including the two cited by Justice J.M. Johnson, WAC 242-02-540 and RCW 36.70A.290(4), provide the Board with the discretion to supplement the record with additional evidence. Additionally, RCW 34.05.449(2) provides for a response to introduced evidence only "[t]o the extent necessary" as determined by the Board. Finally, RCW 34.05.452(3) merely provides that "[a]ll testimony of parties and witnesses . . . be made under oath." Thus, if there is any tension between these provisions and the Board's use of Dr. Soule, and it appears that there is not, it does not justify reversing the Board's decision.
[7] The amount of nonrecord materials is very slight in comparison to the entirety of the administrative record. The materials in question consisted of four publications:

"(1) Hymanson, Kingma-Rymek, Fishbain, Zedler and Hansch, California Coastal Commission: `Procedure Guidance for Evaluating Wetland Mitigation Projects in California's Coastal Zone';
"(2) `Use of Monitoring and Adaptive Management to Promote Regeneration in the Allegheny National Forest,' Lois DeMarco, USFS [United States Forest Service] National Silvicultural Workshop, Kalispell, Montana;
"(3) Salafsky, Margoluis and Redford, "Adaptive Management: A Tool for Conservation Practitioners," World Wildlife Fund, Inc. (2001); and
"(4) The British Columbia Forest Practices Code." Skagit County's Opening Br. at 17. A reference to any of these four documents occurs only on three pages of the Board's 2005 order.
[8] The concurrence/dissent asserts that we should reverse the Board's 2005 decision because the Board failed to give the proper "deference" to the county's "assurance[]" of future compliance under the "clearly erroneous" standard. Concurrence/dissent at 1211. Without question, the "clearly erroneous" standard requires that the Board give deference to the county, but all standards of review require as much in the context of administrative action. The relevant question is the degree of deference to be granted under the "clearly erroneous" standard. The amount is neither unlimited nor does it approximate a rubber stamp. It requires the Board to give the county's actions a "critical review" and is a "more intense standard of review" than the arbitrary and capricious standard. See, e.g., Cougar Mountain Assocs. v. King County, 111 Wash.2d 742, 749, 765 P.2d 264 (1988). And even the more deferential "arbitrary and capricious" standard must not be used as a "rubber stamp" of administrative actions. See Ocean Advocates v. United States Army Corps of Eng'rs, 361 F.3d 1108, 1118, 1119 (9th Cir.2004).
[9] The Board specifically held, "The question is what will work to protect fish habitat in the same environment where ongoing agriculture is well-functioning and being conserved. Adaptive management is a creative tool to explore possible solutions, but it requires rigor, commitment, and prompt change in response to indications of problems in order to ensure that the county's less-than-precautionary protections of fish habitat in ongoing agricultural lands comply with RCW 36.70A.040, .060, and .172. The monitoring and adaptive management system . . . still does not establish an overall protection strategy for fish and wildlife habitat in ongoing agricultural lands that complies with these provisions of the GMA." AR at 1304-05. has befallen it and it was protected. This is true by definition.
[1] "[T]he growth management hearings boards do not have authority to make `public policy' even within the limited scope of their jurisdictions, let alone to make statewide public policy." Viking Props., Inc., 155 Wash.2d at 129, 118 P.3d 322. This opinion does not reach the broader constitutional question of whether these sui generis unelected boards, appointed by the governor, may overrule county legislators and micromanage land use plans for counties.
[2] The parties involved in this litigation, as well as the agencies listed above, are encouraged to provide relevant scientific input to the County (as mandated by the GMA).
[3] The four nonrecord publications did not even address the unique circumstances of Skagit County, and it seems unlikely that they were relevant to hearings to the Board. The studies did not address any geographic area inside Washington, but instead analyzed environmental conditions in California, Oregon, and British Columbia. See majority at 1207, n. 5. Even if the studies were held to be relevant, the County was deprived of any opportunity to rebut the issues addressed in the four nonrecord publications.
[4] Moreover, none of the four nonrecord publications were admitted through a motion to supplement the record pursuant to WAC 242-02-540. The Board thereby failed to comply with APA requirements and its own rules for supplementing the record.
[5] The Board did not qualify the "expert" as is normally required to ensure material testimony. See Wash. R. Evid. 702. Here, there was no adversarial process to determine the professor's expertise or competency.
[6] The County and the tribe had no chance to cross-examine Dr. Soule as his testimony was presented in a letter, not under oath. See Weyerhaeuser v. Pierce County, 124 Wash.2d 26, 33, 873 P.2d 498 (1994). Furthermore, the Board apparently failed to supply him the EPA protocols or any other materials upon which the County based its decision. AR at 1344. The Board apparently provided Dr. Soule only selected materialsall were exhibits presented by the Swinomish Indian Tribal Community. Id.
[1] The majority contends that my approach "confuses the question of how an object is protected with the question of whether it was protected." Majority at 1205 n. 4. However, in order to determine whether Skagit County's ordinance adequately protected the riparian fish and wildlife habitat under RCW 36.70A.060(2), we must first establish what procedures are necessary  i.e., how  to protect the critical areas. After that initial inquiry, we then examine whether Skagit County's protection measures satisfied the "protect" requirement.