# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| WHIDBEY ENVIRONMENTAL ACTION NETWORK, | No. 52923-8-II |
| Appellant, | |
| v. | |
| GROWTH MANAGEMENT HEARINGS BOARD, | PUBLISHED OPINION |
| Additional Party, | |
| ISLAND COUNTY, | |
| Respondent, | |

GLASGOW, J.—Whidbey Environmental Action Network (WEAN) challenged Island County's critical areas ordinance adopted under the Growth Management Act (GMA), chapter 36.70A RCW. Relevant to this appeal, WEAN argued that the County's critical areas ordinance was insufficient to protect the western toad, which the Washington Department of Fish and Wildlife has listed for protection as a priority habitat species.

After finding multiple iterations of the ordinance noncompliant with the GMA, the Western Washington Growth Management Hearings Board ultimately upheld the version of the ordinance at issue here as adequately protecting the western toad under the GMA and best available science. The version of the ordinance at issue designates all presently-known and later-identified occurrences of western toad breeding sites as critical areas, as well as all upland occurrences known on the date the ordinance was adopted. The ordinance does not designate later-discovered

upland western toad occurrences as critical areas. The ordinance requires a biological site assessment for any development project proposed within 1,000 feet of a critical area, though the County can waive this requirement if the impacts of the development would be minor. On appeal, the superior court affirmed the Board's ruling.

WEAN appeals, arguing that the Board's ruling was contrary to law, unsupported by substantial evidence, and arbitrary and capricious. WEAN reasons that the ordinance improperly distinguishes between upland dispersal habitat and wetland breeding habitat where the Department's best available science established that *any* occurrence must be protected. WEAN also argues that the ordinance fails to adequately apply the precautionary approach, as the GMA requires when the science is uncertain. WEAN contends that the 1,000-foot radius for requiring a biological site assessment is arbitrary in that it universally applied to all critical areas and was not western toad-specific. WEAN also challenges the provision enabling the County to waive the biological site assessment requirement if development impacts will be minor.

We hold that WAC 365-190-130(4)(b) expressly establishes that the Department's priority habitat and species information for candidate species is the "best available science" and the Department has established that *any* occurrence of the western toad should be designated as a critical area. The Board misapplied the GMA's best available science requirement by upholding the County's decision that only those upland occurrences known to the County at the time the ordinance was adopted would be designated as critical areas. This decision also violated the precautionary approach because the lack of scientific understanding regarding upland western toad habitat means upland occurrences should be designated and protected when they are discovered.

We also hold that the provision granting the planning director unrestricted discretion to waive the required biological site assessment is contrary to law. However, we reject WEAN's challenge to the 1,000-foot radius for requiring a biological assessment because WEAN has failed to meet its burden to show that the 1,000-foot radius was arbitrary and capricious.

We accordingly reverse the Board's ruling upholding the County's decision not to automatically designate any later-identified upland occurrences and the provision allowing the County to waive the biological site assessment when the planning director determines development impacts will be minor. We affirm in all other respects.

FACTS

The Department lists the western toad as a "[c]andidate species" because the toad is a candidate for listing as sensitive, threatened, or endangered. Administrative Record (AR) at 4071. Candidate species are also classified as "priority species," under the "Priority Habitats and Species Program," which means the western toad is "a priority for conservation and management and requires protective measures for survival." AR at 4071, 4080.

The Department classifies the western toad's "[p]riority [a]rea" as "[a]ny occurrence." AR at 4073. This designation "[a]pplies to a priority species with limiting habitat that is not known or to a species that is so rare that any occurrence is important in a land use decision." AR at 1424. The Department defines "[o]ccurrence" as a "[f]ish and wildlife observation from a source deemed reliable by [Department] biologists. An occurrence may represent an observation of an individual animal or a group of animals." *Id.* (bold type omitted). "'Occurrences are based on evidence of historical presence, or current and likely recurring presence, at a given location.'" AR at 5718.

3

The County's deadline for updating its critical areas ordinance designating critical areas for habitat protection was December 1, 2005, which it missed. RCW 36.70A.130(4)(b). The County ultimately updated its designations in a 2014 ordinance that included protections for western toad habitat. The next deadline for the County to review and update its critical areas ordinance is in 2024.

WEAN challenged the 2014 ordinance under the GMA, and the Board ultimately agreed with WEAN that the ordinance was flawed in several respects and ordered the County to amend it. The County enacted a new ordinance in response to the Board's order, which WEAN continued to challenge. Relevant to this appeal, WEAN argued that the ordinance did not adequately protect the western toad. The Board agreed, ruling that this second ordinance was flawed in that it did not clearly protect the western toad's breeding site and did not protect upland, nonbreeding habitat at all. The Board once more ordered the County to address its continued noncompliance with the GMA and include best available science.

The County then enacted a third iteration of its critical areas ordinance, the version that is at issue in this appeal. *See* ISLAND COUNTY CODE (ICC) 17.02B. With respect to the western toad, the ordinance provides:

> Western Toad breeding sites, as documented by scientifically verifiable data from [the Department], or a qualified professional, shall be protected through the county's wetland and stream critical areas regulations . . . . Such breeding sites, as they are presently known and documented as provided above, *or may later be identified* through the processing of site-specific land use and development permits or other scientifically verifiable data, are designated as fish and wildlife habitat conservation areas. *Also designated as fish and wildlife habitat conservation areas are the occurrences identified by Priority Habitat Species data from [the Department] as it existed on January 24, 2017.*

ICC 17.02B.210 (emphasis added). In other words, the ordinance designates all presently-known and later-identified breeding sites as critical areas, but it only designates other upland occurrences of the western toad that were known on January 24, 2017, the date this ordinance was adopted. The practical effect of this provision at the time the ordinance was adopted was the designation of six individual occurrences—one associated with an aquatic breeding site and five associated with upland, nonbreeding sites.

The ordinance also provides, in a provision that is more generally applicable to all protected species, that "[w]hen a development proposal is located within 1,000 feet of a habitat for a protected species or an identified fish and wildlife habitat conservation area or its buffer . . . a biological site assessment . . . shall be required." ICC 17.02B.400(A). This requirement can be waived if the County's planning director "determines that the proposed development would result in only minor impacts." ICC 17.02B.400(A)(1).

WEAN again challenged the ordinance, but this time the Board upheld it as complying with the GMA. The Board upheld the County's differing treatment of upland habitat and breeding sites, noting that the best available science was "thin" with respect to upland and dispersal habitat, while it clearly established that the western toad has a "'primary association'" with wetlands as breeding habitat. AR at 5723. The Board also upheld the provision granting the planning director discretion to waive the biological site assessment requirement on the grounds that the provision is presumed valid and the Board would not assume that the County would abuse its discretion when applying the waiver provision without any evidence that the County was likely to do so.

WEAN moved for reconsideration. The Board denied the motion. This order denying reconsideration and the Board's prior order finding compliance are the basis for the current appeal.

In its denial of reconsideration, the Board again concluded that the best available science did not support any additional designations.

Although the Board noted "the importance of upland, non-breeding dispersal areas for the Western toad," it concluded that the best available science considered by the County demonstrated that additional areas beyond the currently documented occurrences did not warrant designation. AR at 5972. The Board pointed to material prepared by an outside consultant commissioned by the County in support of treating breeding and upland habitat differently. The County's consultant concluded that breeding sites "'represent areas with which the species is known to have a primary association.'" AR at 5973. The consultant opined that "'[g]iven the variety of upland habitats used by western toad and the predominantly rural nature of unincorporated Island County, upland habitat for western toad is not known to be limiting in the County.'" *Id.* In contrast, the consultant concluded that "'Western toads are known to exhibit some level of breeding site fidelity, meaning that they return to the same wetland site in subsequent years. Therefore, a documented breeding area could be expected to support Western toads in years subsequent to the observation.'" *Id.*

The Board relied on the consultant's analysis to conclude that the differences between breeding and upland habitat, the lack of understanding regarding the importance of upland habitat, and the relative abundance of upland habitat in the County, supported the County's decision to treat breeding sites and upland habitat differently in the ordinance. The Board also noted that the 1,000-foot requirement for a biological site assessment further served to protect the western toad, and WEAN had not shown that the County had failed to consider best available science in establishing that provision.

WEAN appealed the Board's ruling to the superior court, which affirmed. WEAN appeals.

ANALYSIS

A.     The GMA and Related Regulations

       1.     Critical area designations

The GMA requires cities and counties to adopt regulations to protect environmentally critical areas, which include habitats of priority species and species of local importance. *See* RCW 36.70A.060(2), .170(1)(d); WAC 365-190-130(2)(b). Local governments must review and update their critical areas ordinances every eight years to ensure they continue to meet the GMA's standards. RCW 36.70A.130(5)(b).

Critical areas include fish and wildlife habitat conservation areas, which are defined as "areas that serve a critical role in sustaining needed habitats and species for the functional integrity of the ecosystem, and which, if altered, may reduce the likelihood that the species will persist over the long term." WAC 365-190-030(6)(a). "These areas may include, but are not limited to, rare or vulnerable ecological systems, communities, and habitat or habitat elements including seasonal ranges, breeding habitat, winter range, and movement corridors; and areas with high relative population density or species richness." *Id.*

Local governments should also identify and designate "locally important habitats and species" by considering information regarding priority habitats and species identified by the Department. WAC 365-190-030(6)(a), -130(4)(b). "Priority habitat" includes priority species breeding habitat and seasonal ranges. AR at 4104. The Department's "[p]riority habitat and species information includes endangered, threatened and sensitive species, but also includes candidate species and other vulnerable and unique species and habitats." WAC 365-190-130(4)(b). "While

these priorities are those of the [Department], they should be considered by counties and cities *as they include the best available science*." *Id.* (emphasis added).

When a local government designates a critical area, it must preserve the area's "existing functions and values." WAC 365-196-830(4). Local governments should use maps and performance standards to designate critical areas, but performance standards are preferred. WAC 365-190-080(4). Significantly for purposes of this case, WAC 365-190-040(5)(b) provides that government inventories and maps should indicate these designations, but "where critical areas cannot be readily identified, these areas should be designated by performance standards or definitions, so they can be specifically identified during the processing of a permit or development authorization."

2.      Best available science and the precautionary approach

The GMA requires local governments to use "best available science" when designating and protecting critical areas. RCW 36.70A.172(1). "No precise definition of 'best available science' is found in the statutes or in case law, but the phrase is generally interpreted to require local governments to analyze valid scientific information in a reasoned process." *Kitsap All. of Prop. Owners v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 160 Wn. App. 250, 267, 255 P.3d 696 (2011). The record must show that the County considered the best available science substantively in its designation and protection of a critical area. *Id.*

"By RCW 36.70A.172(1), 'the Legislature left the cities and counties with the authority and obligation to take scientific evidence and to balance that evidence among the many goals and factors to fashion locally appropriate regulations based on the evidence not on speculation and surmise.'" *Ferry County v. Growth Mgmt. Hr'gs Bd.*, 184 Wn. App. 685, 734, 339 P.3d 478 (2014)

(quoting *Honesty in Envtl. Analysis & Legislation (HEAL) v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 96 Wn. App. 522, 531, 979 P.2d 864 (1999)). "Mere inclusion of scientific sources in a critical areas ordinance is not sufficient. To demonstrate that [best available science] has been included, counties and cities should address the [best available science] on the record." *Id.* at 735-36 (citation omitted).

The GMA "does not require the county to follow [best available science]; rather, it is required to include [best available science] in its record. Thus, a county may depart from [best available science] if it provides a reasoned justification for such a departure." *Id.* at 740. However, that "departure from [best available science] in a critical areas ordinance should be rare." *Id.*

The relevant regulations expressly establish that the Department's priority habitat and species information includes the best available science. WAC 365-190-130(4(b); *Ferry County*, 184 Wn. App. at 734; *see also Olympic Stewardship Found. v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 166 Wn. App. 172, 193, 274 P.3d 1040 (2012) ("[The GMA's] regulations are the proper starting point for determining whether a county has complied with RCW 36.70A.172(1)'s 'best available science' requirement.").

Further, WAC 365-195-920(1) and (2) provide: "Where there is an absence of valid scientific information or incomplete scientific information relating to a county's or city's critical areas, leading to uncertainty about which development and land uses could lead to harm of critical areas," counties and cities should follow a "'precautionary or a no risk approach'" to strictly limit development until the uncertainty is resolved and, as an interim approach, use "an effective adaptive management program that relies on scientific methods to evaluate how well regulatory and nonregulatory actions achieve their objectives."

No. 52923-8-II

B.      Burden of Proof and Standard of Review

The Administrative Procedure Act, chapter 34.05 RCW, governs appellate review of the Board's decisions under the Act. *Swinomish Indian Tribal Cmty. v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 161 Wn.2d 415, 424, 166 P.3d 1198 (2007). "On appeal from the superior court, we sit in the same position as the superior court and review the agency's order based on the administrative record rather than the superior court's decision." *B&R Sales, Inc. v. Dep't of Labor & Indus.*, 186 Wn. App. 367, 374, 344 P.3d 741 (2015). "We treat any findings of fact or conclusions of law the superior court made as surplusage." *Morawek v. City of Bonney Lake*, 184 Wn. App. 487, 491, 337 P.3d 1097 (2014).

The party asserting the invalidity of an agency's decision has the burden of demonstrating invalidity. RCW 34.05.570(1)(a); *PacifiCorp v. Wash. Utils. & Transp. Comm'n*, 194 Wn. App. 571, 586, 376 P.3d 389 (2016). RCW 34.05.570(3) sets out nine grounds for invalidating an agency decision. WEAN's challenge argues three of those grounds: (1) the Board misapplied the law, (2) the Board's factual findings were not supported by substantial evidence, and (3) the Board's decision was arbitrary and capricious. RCW 34.05.570(3)(d), (e), (i).

Under the error of law standard, we give substantial weight to the agency's interpretation of the law it administers, but we are not bound by it. *Life Care Ctrs. of Am., Inc. v. Dep't of Soc. & Health Servs.*, 162 Wn. App. 370, 374-75, 254 P.3d 919 (2011). We review the Board's factual findings for substantial evidence, asking whether the record contains evidence sufficient to convince a rational, fair-minded person that the finding is true. *B&R Sales*, 186 Wn. App. at 375. We do not reweigh evidence or judge witness credibility, but instead defer to the agency's broad discretion in weighing the evidence. *PacifiCorp*, 194 Wn. App. at 588-89.

10

"An agency's action is arbitrary and capricious only if it 'is willful and unreasoning and taken without regard to the attending facts or circumstances.'" *Id.* at 587 (internal quotation marks omitted) (quoting *Att'y Gen.'s Office v. Wash. Utils. & Transp. Comm'n*, 128 Wn. App. 818, 824, 116 P.3d 1064 (2005)). "'Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous.'" *Id.* (internal quotation marks omitted) (quoting *Att'y Gen.'s Office*, 128 Wn. App. at 824). "'Neither the existence of contradictory evidence nor the possibility of deriving conflicting conclusions from the evidence renders an agency decision arbitrary and capricious.'" *Id.* (quoting *Att'y Gen.'s Office*, 128 Wn. App. at 824).

C.      Application of the Relevant Regulations and Best Available Science on Western Toads

Under WAC 365-190-130(4)(b), the Department's priority species habitat information is considered best available science. The Department has classified the western toad's "[p]riority [a]rea" as "[a]ny occurrence." AR at 4073. The Department's "[a]ny [o]ccurrence" designation "[a]pplies to a priority species with limiting habitat that is not known or to a species that is so rare that any occurrence is important in a land use decision." AR at 1424. The Department has defined "[o]ccurrence" as a "[f]ish and wildlife observation from a source deemed reliable by [Department] biologists. An occurrence may represent an observation of an individual animal or a group of animals." *Id.* "'Occurrences are based on evidence of historical presence, or current and likely recurring presence, at a given location.'" AR at 5718.

WEAN argues that the County violated the GMA's requirement that it use best available science in designating critical areas when it failed to provide for the automatic designation of newly-identified upland occurrences of the western toad, as it did for newly-identified breeding

11

sites. WEAN contends that the Board's decision upholding the ordinance on this basis was arbitrary and capricious and unsupported by substantial evidence. WEAN's argument also implicates whether the Board misapplied the GMA's best available science requirement or the related regulations, and so committed legal error.

The County argues that it properly designated every known occurrence of the western toad at the time the ordinance was adopted and it was not required to do more. The County also argues that it went beyond what the GMA requires by providing for automatic designation of later-identified breeding sites and that it was not required to extend this "'extra'" protection to nonbreeding sites as well because its current plan of simply updating its designations in 2024 with newly discovered occurrences satisfies the GMA's requirements. Resp't's Br. at 33 (emphasis omitted).

The Board agreed with the County that newly-identified upland occurrences of western toad need not be designated in the critical areas ordinance until the critical areas ordinance is updated, which should occur in 2024 if the County meets its deadline:

> The science available in 2016/2017 in regards to the Western toad may not be the same in 2024 when Island County next reviews its critical area regulations. If [best available science] at that time indicates a need to designate and/or regulate activity in additional areas for protection of the toad, the County will need to include consideration of that [science].

AR at 5971; *see also* RCW 36.70A.130(1)(a), (c), (5), (6), as amended by ENGROSSED SUBSTITUTE HOUSE BILL 2342, ch. 113, LAWS OF 2020; SUBSTITUTE HOUSE BILL 2246, ch. 20, LAWS OF 2020 (requiring review of critical areas ordinances every eight years).

WEAN, the County, and the Board all agree, however, that the Department's designation of the western toad's habitat priority area as "any occurrence" is based on best available science,

and that "any occurrence" is a priority area for protection. The crux of this dispute is whether "any occurrence" can be limited to occurrences that have been documented by the date a critical areas ordinance was adopted.

### 1. Plain and ordinary meaning

We conclude that limiting "any occurrence" to occurrences that have been documented by the date a critical areas ordinance was adopted is contrary to the plain meaning of the words "*any occurrence.*" One dictionary definition of "any" is "used . . . to indicate one that is selected *without restriction or limitation of choice* <[Any] child would know that>." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 97 (2002) (emphasis added). In addition, the Department defines "[o]ccurrence" as a "[f]ish and wildlife observation from a source deemed reliable by [Department] biologists." AR at 1424 (bold type omitted). This language supports WEAN's contention that the "any occurrence" designation requires a continuous updating of the County's designations, because an occurrence happens any time a reliable source makes a wildlife observation, not several years later when the County is scheduled to update its regulations.

### 2. Regulatory preference for definitional or performance standards

Limiting "any occurrence" also fails to read the classification in context with WAC 365-190-040(5)(b)'s admonition to designate critical areas with performance standards or definitions rather than static designations "where critical areas cannot be readily identified . . . so they can be specifically identified during the processing of a permit or development authorization." This provision supports WEAN's argument that using definitional criteria (here, the Department's definition of "occurrence") permits ongoing identification of critical areas meeting the definition before the ordinance is updated, sometimes many years later.

In upholding the County's decision not to automatically designate later-identified upland occurrences, the Board relied on maps of western toad occurrences as they were known in 2017. These maps presented only a static snapshot of the western toad's dispersal at that time, in contrast to the "performance standards or definitions" that should be used to identify critical areas that currently exist but have not yet been identified. WAC 365-190-040(5)(b). Although both maps and performance standards can be used to designate critical areas, "because maps may be too inexact for regulatory purposes, counties and cities should rely primarily on performance standards to protect critical areas." WAC 365-190-080(4)(a). Thus, WAC 365-190-040(5)(b) and -080(4)(a) support ongoing designation of later-identified upland occurrences.

In its decision on reconsideration, the Board reasoned that "best available science" requires only that a local government consider science *available* at the time the critical areas ordinance is adopted and it need not account for later identification of habitat. But this interpretation of the term "best available science" flatly contradicts these regulations that contemplate definitional and performance standards so that critical areas can be identified as covered species and habitat are discovered between ordinance updates. We reject the Board's reasoning.

3.      Precautionary approach

Finally, limiting any occurrence as the County suggests also fails to apply the precautionary approach required where the science is uncertain. WAC 365-195-920(1). WAC 365-195-920(1) and (2) provide: "Where there is an absence of valid scientific information or incomplete scientific information relating to a county's or city's critical areas, leading to uncertainty about which development and land uses could lead to harm of critical areas," counties and cities should follow a "'precautionary or a no risk approach'" to strictly limit development until the uncertainty is

resolved and, as an interim approach, use "an effective adaptive management program that relies on scientific methods to evaluate how well regulatory and nonregulatory actions achieve their objectives."[1]

As an initial matter, the County argues that the "'no risk'" approach WEAN advocates for is stricter than the "'no harm'" approach required by the GMA. Resp't's Br. at 35-36 (emphasis omitted) (citing *Swinomish*, 161 Wn.2d at 427-30). But the portion of the court's opinion that the County relies on does not discuss the precautionary approach or suggest a lesser standard than that articulated in WAC 365-195-920. Rather, the Washington Supreme Court upheld a Skagit County ordinance requiring the agricultural industry to do "no harm" to critical areas, rejecting Swinomish's argument that the GMA required the county to enhance fish habitat rather than merely protect it. *Swinomish*, 161 Wn.2d at 427-30. The court discussed WAC 365-195-920 later in the opinion, and it did not indicate that it was adopting a lesser standard than what appeared in the regulation. *Id.* at 436. Instead, the court explained that the regulation requires local governments to "either be certain that their critical areas regulations will prevent harm or be prepared to recognize and respond effectively to any unforeseen harm that arises." *Id*.

There are two Court of Appeals cases that analyze the "'precautionary or [] no risk approach'" outlined in WAC 365-195-920(1). In *Yakima County v. Eastern Washington Growth Management Hearings Board*, 168 Wn. App. 680, 279 P.3d 434 (2012), Yakima County enacted

---

[1] The County argues that this issue is not properly before us because the Board never ruled on it. *See Somers v. Snohomish County*, 105 Wn. App. 937, 945, 21 P.3d 1165 (2001) ("The question of whether a county is in compliance with the [GMA] is an issue over which the [Board] has exclusive subject matter jurisdiction."). WEAN argued to the Board that the County failed to apply the precautionary approach, and the Board rejected WEAN's challenge. This was sufficient to preserve the issue for appeal.

a new critical areas ordinance that maintained stream buffers that had been in place since 1995. The Board ruled that these buffers were not supported by best available science and the County had not provided a reasoned justification for departing from that science. *Id.* at 693. Division Three agreed with the Board in this regard, rejecting the County's argument that, given the lack of scientific certainty regarding what buffers were needed, the County reasonably concluded that the existing buffers were minimally adequate. *Id.* Division Three reasoned: "If the absence of relevant scientific information creates uncertainty about the development risks to a critical areas function, Yakima County must follow WAC 365-195-920(1) and use a 'precautionary or a no risk approach' that strictly limits land use activities until the uncertainty is sufficiently resolved." *Id.* (internal quotation marks omitted).

In *Ferry County*, 184 Wn. App. at 742, Ferry County refused to list certain species in its critical areas designation because the Department could not confirm the species' breeding habitat. Division Three upheld the Board's conclusion that this did not constitute a reasoned justification for departing from the best available science because the Department had determined that breeding habitats are not the only habitats requiring protection. *Id.* The court reiterated that "[i]n the absence of scientific evidence, a county should adopt a precautionary or no risk approach. WAC 365-195-920." *Id.* The court also explained that "even if the lack of science were a valid reason to not designate a species, Ferry County provided no explanation for why, in particular, the breeding locations of a species must be known in order to designate them as locally important." *Id.*

Here, both the County and the Board acknowledge that the extent of the western toad population and its upland habitat are unknown. The Department classifies species habitat for

protection upon "[a]ny [o]ccurrence" when "a priority species [has] limiting habitat that is not known." AR at 1424 (bold type omitted).

Given the acknowledged gaps in scientific knowledge about the extent of western toad upland habitat and its importance to the toad's survival, *Ferry County* and *Yakima County* both suggest that the County here should have taken a more cautious approach toward upland habitat. It is true that in both of those cases the Board ruled that the counties violated the precautionary approach, whereas here the Board agreed with the County. Therefore, WEAN has a higher hurdle to clear in this case because it must show that the Board's decision was invalid. *PacifiCorp*, 194 Wn. App. at 586, 588-89.

But the lack of scientific understanding regarding the importance of upland habitat and its relative scarcity in the County was a reason why upland occurrences should have received the same automatic designation as breeding sites. The Board understood that "'this current limited understanding of upland habitat usage'" was a reason to require more from the County, not less. AR at 5973. In the face of this scientific uncertainty regarding the importance of upland habitat, the County was required to take the precaution of providing for automatic designation of upland occurrences of the western toad when they are identified.

The precautionary principle requires the County to take a "precautionary or no risk approach," *Ferry County*, 184 Wn. App. at 742, but the County is taking the very real risk that upland western toad habitat discovered after 2017 may be destroyed or compromised by development before the County updates its designations in 2024, or later if the County is not timely with its update. And the fact that locations of upland occurrences are not currently known does not mean they should not be designated when they are located. *See id*. Therefore, the Board's decision

to uphold the ordinance misapplied the law by failing to apply the precautionary principle in this case.

In sum, we conclude that the County and the Board misapplied what has been established by regulation to be the best available science when it limited any upland occurrence to any upland western toad occurrence known before the date the ordinance was adopted. This limitation on "any occurrence" conflicts with the plain meaning of the words, the regulatory admonition to use standards rather than designations that are fixed, and the precautionary principle also established by regulation. To the extent that the County and the Board failed to correctly apply the relevant regulations and the best available science, that is also arbitrary and capricious because it is unreasonable in light of current law.

4.      The County's other arguments regarding upland western toad habitat

The County and the Board relied on the County's biological consultant's materials that distinguish between more valuable breeding habitat and potentially less valuable upland habitat. There is substantial evidence in the record to support the conclusion that the value and scarcity of breeding and upland habitats are different. The consultant noted that the best available science in this case "'indicates that wetland breeding habitats are critical to completion of the life cycle of the Western toad. In contrast, the upland habitat characteristics associated with Western toad are not well understood.'" AR at 5973). The science also showed that "[g]iven the variety of upland habitats used by Western toad and the predominantly rural nature of unincorporated Island County, upland habitat for Western toad is not known to be limiting in the County." *Id.*

Nevertheless, the Board recognized that the best available science "supports the designation of 'priority areas' with any reliably documented 'occurrence' of Western toad, whether

breeding or non-breeding." AR at 5972 (bold type omitted). The Board also concluded that neither the GMA nor the best available science "distinguish[es] between breeding and non-breeding sites for purposes of complying with the current GMA requirement to update [fish and wildlife habitat conservation area] designations." AR at 5974. And neither the County nor the Board disputes that the Department's priority species habitat information and classification is considered best available science or that the Department has classified the western toad's "[p]riority [a]rea" as "[a]ny occurrence." AR at 4073. Instead, they read "any occurrence" to allow limitation based on the date of discovery, a position that is contrary to law for the reasons discussed above.[2]

The County also argues that, even assuming it departed from the best available science, it properly considered that science, but simply made a different policy choice than what WEAN advocated for. Although the County was not necessarily required to follow best available science, any departure from the best available science requires a reasoned justification and should be rare. *Ferry County*, 184 Wn. App. at 740. The County does not point to any such justification in the record or in its briefing apart from the general notion that sound policy must consider other factors beyond purely scientific evidence. Instead, the County maintains that it *did not* depart from the best available science because the science does not support designating unknown future upland occurrences due to the lack of knowledge about the western toad's movements and seasonal

---

[2] In *Ferry County v. Concerned Friends of Ferry County*, 155 Wn.2d 824, 836, 123 P.3d 102 (2005), the Supreme Court seemed to say that a local government could ignore a state agency's scientific conclusions and recommendations in favor of legitimate, locally developed best available science. But that case was decided before WAC 365-190-130(4)(b) expressly established that the Department's priority species habitat information is considered best available science. *See Concerned Friends of Ferry County,* 155 Wn.2d at 833 (reciting the text of an earlier version of the regulation simply allowing consideration of the Department's priority species habitat information).

ranges. But WEAN is not arguing that the County must predict future occurrences, it merely argues that the County must treat *any* future occurrences as designated critical areas when they are discovered under the best available science.

In sum, neither of these additional arguments warrants departure from our conclusion that the County and Board misapplied the relevant regulations and the best available science as determined by the Department.

D.      The 1,000-Foot Radius Prompting a Biological Site Assessment

A separate provision of the County's critical areas ordinance provides that "[w]hen a development proposal is located within 1,000 feet of a habitat for a protected species or an identified fish and wildlife habitat conservation area or its buffer . . . a biological site assessment . . . shall be required." ICC 17.02B.400(A). WEAN argues the 1,000-foot radius is insufficient because it was based on a rule designed for heron rookeries and it bears no relation to the dispersal patterns of the western toad. WEAN also argues that this provision ignores the precautionary approach required under WAC 365-195-920(1). The Board rejected WEAN's arguments because WEAN did not provide evidence that a 1,000-foot radius was inadequate.

WEAN co-founder Steve Erickson testified: "'The origin of that thousand foot figure in Island County's ordinance was for protection of heron rookeries. Amphibians were not considered generally in determining that. Western toad was not considered specifically. Different species. Different situation. Different habitat requirements.'" AR at 5832. WEAN claims that the record "contains abundant evidence that Western toads routinely disperse much more than 1,000 feet from their breeding sites, anywhere from 3,000 feet to several kilometers." Appellant's Reply Br. at 22. WEAN primarily cites to portions of its own briefing from below, but there is some evidence in

20

the record that western toads do typically move much farther than 1,000 feet from breeding sites. And WEAN points to science in the record suggesting that "overall contiguous forest cover values of 40%, 50%[,] and 60% within 100, 500[,] and 1,000 meter distances respectively from wetlands may represent critical thresholds for maintaining the full diversity of amphibians breeding in a wetland or stream." AR at 5012.

The provision establishing a 1,000-foot radius for requiring a biological site assessment was not intended to be specific to the western toad. It applies broadly to all fish and wildlife habitat conservation areas designated in Island County. WEAN does not show that western toads are harmed by the 1,000-foot radius such that its application to western toad habitat is arbitrary and capricious. Moreover, this provision simply provides a *minimum* radius within which the County *must* require an assessment for all designated areas. Nothing prevents the County from requiring or implementing such assessments further than 1,000 feet away from designated occurrences of the western toad when appropriate.

In addition, WEAN does not adequately explain why it is improper for the County to adopt a uniform standard for requiring biological site assessments. Many counties have enacted similar uniform provisions requiring some manner of impact analysis if development is proposed within a certain radius of critical areas, without regard to the movement patterns of specific species. *See, e.g.*, CHELAN COUNTY CODE 11.78.070, .080 (requiring certain review standards for developments proposed within 1,000 feet of a wildlife habitat conservation area); CLALLAM COUNTY CODE 27.12.320, .325 (outlining standards for any development proposed "within the jurisdiction of . . . wildlife habitat conservation areas"); DOUGLAS COUNTY Code 19.18C.050(B)(1) (requiring a habitat management and mitigation plan for any development proposed within 1,000 feet of a listed

species "den, nesting, or breeding site"); GARFIELD COUNTY CODE 14.6(B) (requiring a "[c]ritical [a]rea [r]eport" addressing all critical areas located within 300 feet of a project area); GRANT COUNTY CODE 24.08.320(d) (requiring a "site assessment report" covering "all area within 300 feet of a proposed development activity"); LEWIS COUNTY Code 17.38.050(1)(b)(i) (requiring a "critical area assessment report" for any proposed development "within, abutting, or likely to adversely affect a critical area or buffer"); MASON COUNTY CODE 8.52.170(D)(1)(a)(iii) (requiring a "preliminary review" when a major development is proposed within a quarter of a mile of a "listed species point location"). WEAN has not met its burden to show that ICC 17.02B.400(A) is invalid or that the County was required to adopt a western toad-specific radius within which a biological assessment must occur.

E.     Enforcement

WEAN's final argument is that the ordinance improperly and arbitrarily allows for its protective measures to be waived. Specifically, WEAN challenges the provision that allows the County to waive the requirement for a biological site assessment whenever it determines that development impacts will be minor. ICC 17.02B.400(A)(1). In its opening brief, WEAN suggests that the term "minor" is so vague that it is unconstitutional. Appellant's Br. at 35. But in its reply brief, WEAN retreats from this constitutional argument, arguing instead that this waiver provision is contrary to law because it undermines the enforcement of the ordinance to such an extent that it violates the GMA's mandate to protect critical areas and "not allow a net loss of the functions and values of the ecosystem." WAC 365-196-830(4); *see* Appellant's Reply Br. at 23.

The Board declined to overturn this waiver provision because ordinances are presumed valid and the Board declined to assume that the County would abuse its discretion when applying

the waiver. We agree with WEAN that this was error. This waiver provision is contrary to law because, unlike a long list of other counties, Island County has failed to provide any guidelines or parameters to ensure county officials comply with the precautionary principle and adequately protect critical areas when evaluating waivers. *See* WAC 365-195-920.

Island County's waiver provision places no restrictions or guidelines on the County planning director's discretion to deem development impacts minor enough to waive the biological assessment, giving a single County official nearly unfettered discretion. ICC 17.02B.400(A)(1). If a County official can unilaterally waive biological site assessments without any transparent process or criteria for making that decision, then there is reason to doubt that the County's application of the assessment requirement in fact implements the precautionary approach required under WAC 365-195-920 in any meaningful way.[3]

In *Swinomish*, the Supreme Court held that the lack of an adequate monitoring system negated any possibility that Skagit County's adaptive management program could comply with the GMA. 161 Wn.2d at 436-37. The monitoring system was flawed because it lacked adequate benchmarks from which to measure new data collected in the future. *Id.* at 434-35. WEAN argues that a similar situation is present here—the waiver provision in the critical areas ordinance, ICC 17.02B.400(A)(1), does not specify how the County will determine when a biological assessment is unnecessary, so the ordinance in essence contains inadequate benchmarks from which to

---

[3] The County points to other provisions in the ordinance that describe what must be included in a biological site assessment and establish guidelines for what level of detail it should contain. *See* ICC 17.02B.400(B), .430(F)-(H). But these provisions, for the most part, only help guide the planning director's discretion in carrying out the assessment; they do not guide the director's decision in determining whether to waive the assessment in the first place. The ordinance does provide more detailed standards for determining when a biological site assessment is unnecessary in certain situations involving agricultural land. *See* ICC 17.02B.400(A)(2).

measure when a proposed development may pose a risk to a critical area making waiver inappropriate.

Although this case concerns enforcement rather than adaptive management, we agree that similar concerns are present here. As in *Swinomish*, the challenged waiver provision does not provide sufficient guidance to ensure compliance with the GMA's requirements for protecting critical areas. ICC 17.02B.400(A)(1) also violates the precautionary approach mandated by WAC 365-195-920(1) because it does not "strictly limit[] land use activities" until scientific uncertainty is resolved. *Yakima County*, 168 Wn. App. at 693. Instead, the provision allows a waiver to bypass a key mechanism for achieving more certainty—a site specific biological assessment—without any parameters guiding the grant or denial of a waiver. The waiver provision must provide some meaningful parameters for determining what constitutes a minor impact in order for the County to fulfill the requirements under the GMA and its corresponding regulations, including the precautionary requirement.

Many county codes allow some discretion to rest with county officials to determine how to implement certain aspects of their critical areas ordinances, but they also provide benchmarks so that discretion is not completely unfettered. *See, e.g.*, ADAMS COUNTY CODE 18.06.560(C), .570(G) (County may waive required habitat survey or management and mitigation plan for "minor development" if "[(1)] [t]he proposed development is not within the extended proximity of the associated habitat; [(2)] [t]here is adequate information available on the area proposed for development to determine the impacts of the proposed development and appropriate mitigating measures; and [(3)] [t]he applicant provides voluntary deed restrictions that are approved by the county."); BENTON COUNTY CODE 15.02.180(c)(2) (County may waive required critical area report

if it determines that the best available science shows that the proposed activity is "unlikely to degrade the functions or values of the critical area" and there is substantial evidence that "(i) [t]here will be no alteration of the critical area or buffer; (ii) [t]he development proposal will not impact the critical area in a manner contrary to the purpose, intent, and requirements of [the county's critical area regulations]; and (iii) [t]he proposal is consistent with other applicable regulations and standards."); COLUMBIA COUNTY CODE 16.10.100(H)(3)(a) (same); FRANKLIN COUNTY Code 18.08.090(B) (same); LINCOLN COUNTY Code 18.16.130(H) (same); WHATCOM COUNTY Code 16.16.250(D) (County may waive required critical areas review if (1) the proposed development is on a parcel that was approved under a previous review and conditions and regulations have not changed, (2) all critical areas on the parcel have been identified and the effects of the proposed development "have been thoroughly considered in accordance with the current regulations and best available science," (3) the proposed development complies with all permit conditions, and (4) the proposed development "involves a use that is equally or less intensive than the development activity that was subject to the prior permit.").

Unlike ICC 17.02B.400(A)(1), each of these comparable county provisions establishes detailed benchmarks for determining when a required review of potential development impacts can be waived. By failing to provide meaningful standards in this context, ICC 17.02B.400(A)(1) violates WAC 365-196-830(4)'s mandate that "development regulations must preserve the existing functions and values of critical areas" and "may not allow a net loss of the functions and values of the ecosystem that includes the impacted or lost critical areas."

We hold that ICC 17.02B.400(A)(1) is contrary to law because it fails to ensure adequate protection of critical areas and does not comply with the precautionary principle.

## CONCLUSION

We reverse the Board's ruling upholding the County's decision to designate only upland occurrences of the western toad known when the critical areas ordinance was adopted, instead of also designating later-discovered upland occurrences. We also reverse the Board's ruling upholding the provision allowing the County to waive the biological site assessment when the planning director determines development impacts will be minor. We affirm in all other respects.

Glasgow, J.

We concur:

Lee, C.J.

Cruser, J.