# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| IAN MUNCE, | No. 57087-4-II |
| Appellant, | |
| v. | |
| CITY OF ANACORTES and GROWTH MANAGEMENT HEARINGS BOARD, | UNPUBLISHED OPINION |
| Respondents. | |

GLASGOW, C.J. — In 2021, the City of Anacortes updated its critical areas ordinance, which regulates development and other activities around wetlands, geologic hazards, and other sensitive areas. The updated ordinance incorporated recommendations from three expert reports addressing what would be most consistent with best available science. The City also considered numerous public comments made during the four-year adoption process.

Munce petitioned the Western Washington Growth Management Hearings Board for review of the ordinance, alleging violations of the Growth Management Act (GMA), chapter 36.70A RCW, including its public participation requirements. The Board issued a final decision and order, ruling that Munce failed to show the ordinance violated the GMA.

Munce appeals and argues that the City violated the GMA's public participation requirements by changing language about mapping protocols after the last public comment period closed. He also asserts that the ordinance violated the GMA because the City failed to include

monitoring and adaptive management requirements for wetland buffers and failed to allow members of the public to comment on and appeal enforcement actions.

We affirm.

## FACTS

### I. DEVELOPMENT OF THE NEW ORDINANCE

The GMA requires counties and cities to adopt development regulations that protect critical areas. RCW 36.70A.060(2).[1] Critical areas include wetlands, "areas with a critical recharging effect on aquifers used for potable water," frequently flooded areas, "fish and wildlife habitat conservation areas," and geologically hazardous areas. RCW 36.70A.030(11).

Anacortes updated its comprehensive plan in 2016. The new goals and policies included the City's intent to identify and preserve areas of "biological significance" and "[u]se the best available science to preserve or enhance the function and values of critical areas." Admin. R. (AR) at 177. The City then began updating its critical areas regulations to bring them into compliance with its comprehensive plan and the GMA.

A.     Best Available Science

Counties and cities planning under the GMA "must include the best available science . . . when designating critical areas and when developing policies and regulations that protect critical areas." Former WAC 365-190-080(2) (2010); *see* RCW 36.70A.172(1).

Between 2016 and 2019, the City commissioned three best available science reports to inform the revision of its critical areas ordinance.

---

[1] The provisions of the GMA have been updated since the City passed its new ordinance, but the relevant language has not changed, so we cite to the current provisions of chapter 36.70A RCW throughout this opinion.

The 2016 report reviewed the prior critical areas ordinance and suggested updates to bring the ordinance into compliance with guidance from the Department of Ecology, Department of Natural Resources, and the United States Army Corps of Engineers. It also recommended additional studies on certain types of critical areas.

In a list of specific recommendations for revising the ordinance, the 2016 report suggested attaching maps of geologic hazard zones as appendices to the ordinance because that practice would make the maps more accessible to the public than the then-current practice of publishing the maps as appendices to the comprehensive plan. The report also recommended expressly defining adaptive management, which is "a formal and deliberate scientific approach to taking action and obtaining information in the face of uncertainty." Former WAC 365-195-920(2) (2000). Adaptive management is used when "there is an absence of valid scientific information or incomplete scientific information relating to a county's or city's critical areas" that results in uncertainty about which land uses could harm critical areas. Former WAC 365-195-920. The report also recommended deleting a provision requiring the City to perform adaptive management of projects adjacent to critical area buffers because the City typically required monitoring as part of a development applicant's compensatory mitigation plan. *See* ANACORTES MUNICIPAL CODE (AMC) 19.70.130(D) (provision of the new critical areas ordinance requiring projects that may impact critical areas to submit mitigation plans that include a "monitoring and contingency plan" and to provide monitoring reports to the City).

The 2017 report reviewed the prior critical areas ordinance's provisions regarding aquifer recharge and geologic hazard zones, including frequently flooded areas. It recommended alterations to bring the ordinance into compliance with the applicable scientific literature, and the

report highlighted comparison examples of regulations from other jurisdictions that had similar environmental attributes. In part, the report suggested referring to Geographic Information System (GIS) maps to update the city's aquifer maps. This report did not recommend including an adaptive management program in any new critical areas ordinance.

The 2019 report addressed the buffers around fish and wildlife conservation areas, including analyzing the conditions around 15 streams in the city to suggest updates to the ordinance. The report cited to scientific literature, including guidance from the Department of Fish and Wildlife and the Department of Community, Trade, and Economic Development. This report did not recommend including an adaptive management program in any new critical areas ordinance.

B.      Public Participation and Mapping Protocols

The City held several public comment periods about each draft of the new critical areas ordinance. The City received numerous written comments, and there were opportunities for oral comments at planning commission and city council meetings.

1.      2017 draft

In a 2017 draft of the updated ordinance, a general mapping section addressed overall how the public could see where critical areas were:

> The general locations of many critical areas in Anacortes are displayed on the City of Anacortes' Critical Areas Maps, which are hereby adopted by reference. The maps are used to alert the public of the *potential* location of critical areas in Anacortes. As new environmental information related to critical areas becomes available, the Director is authorized to make changes as necessary to the Critical Areas Maps.

AR at 873-74 (emphasis added). The same portion of the 2017 draft also explained that actual site conditions would control over a map designation: "Regardless of whether a critical area is shown

4

on the Critical Areas Map, the actual presence or absence of the features defined in this code as critical areas will govern." AR at 874.

A different section of the 2017 draft addressed how the City would map wetlands. It stated that the "approximate location and extent of wetlands are shown in the wetland data layer maintained in the City of Anacortes geographic information system." AR at 894. The same section also explained that the maps were for reference only: "The maps and resources cited above are to be used as a guide for the [City Planning] Department, project applicants, and/or property owners and may be continuously updated as new critical areas are identified. They are a reference and do not provide a final critical area designation." *Id*. Identical language referencing GIS maps and explaining that the maps were for reference only appeared in the sections of the 2017 draft addressing mapping of fish and wildlife habitats, geologic hazards, and critical aquifer recharge areas.

The City's planning commission received public comments on the 2017 draft at several meetings over the summer of 2017.

2.      2019 draft

A 2019 draft of the ordinance contained the same language as the 2017 draft in the general mapping section. This draft also contained the same language as the 2017 draft in the sections about each type of critical area, stating that the City would use GIS maps and explaining that the maps were for reference only, while actual site conditions would control any critical area designation. The City received public comments on this draft at both planning commission and city council meetings over several months. At least 40 public comments were filed between one planning commission meeting in December 2019 and a second meeting in January 2020. Over the

full course of the comment period, the City received 114 written comments from 75 people. The Department of Ecology also commented on the draft.

    3.      2021 drafts

An early 2021 draft of the ordinance contained the same language about general mapping as the previous drafts. In the general section addressing actual site conditions, this version retained language stating that the City may require an applicant to "submit technical information to indicate whether critical areas actually exist on or adjacent to the applicant's site based on the definitions of critical areas in this code." AR at 1164. The 2021 draft ordinance added language explaining that an applicant may be required to fill out a certain form to provide this information before the City would act on any development permit. In the specific sections about each type of critical area, this version was the same as previous versions, referencing GIS maps and explaining that the maps were for reference only. This version received additional written and oral public comments.

The city council further edited the draft ordinance after the public comment period closed, and the City released another draft in June 2021. This version then received limited additional public comments. The June 2021 draft had different language in the general mapping section than the previous drafts:

> The general locations of many critical areas in Anacortes are displayed on the City of Anacortes' Critical Areas Maps, which are hereby adopted by reference. The maps are used to alert the public of the potential location of critical areas in Anacortes. As new environmental information related to critical areas becomes available, the City is authorized to make changes as necessary to the Critical Areas Maps. The City Geographic Information Systems office must maintain an interactive, publicly available online map containing the location of known and potential critical areas, and must make pdf maps available to the public upon request.

AR at 1265 (alteration in original). This version did not include the clause incorporating the critical areas maps into the ordinance by reference. Instead this version added the requirement in the last sentence that the Geographic Information Systems Office must maintain interactive, publicly available maps of critical areas online and make them available to the public upon request.

The city council passed a final version of the ordinance on July 26, 2021. The final ordinance included the same language in the general mapping section as the June 2021 draft recited above. The final ordinance also retained the language from the preceding drafts stating, "Regardless of whether a critical area is shown on the Critical Areas Map, the actual presence or absence of the features defined in this code as critical areas will govern." AR at 15. The sections about mapping wetlands, fish and wildlife habitats, geologic hazards, and critical aquifer recharge areas all contained the same language explaining that these critical areas would be reflected in publicly available GIS maps that had appeared in the previous drafts, including explaining that the GIS maps were for reference only.

## II. APPEAL TO THE BOARD

Munce petitioned the Board for review of the ordinance. He asserted that the new ordinance violated the GMA and the City's comprehensive plan.

A.    Motion Regarding Public Participation

Before the hearing on the merits, Munce moved for a preliminary determination that the City violated the GMA's public participation requirements when passing the new ordinance. Munce reasoned that the change to the language in the general mapping provision was a significant change from the drafts available for public comment. Munce asserted that the ordinance violated the GMA's public participation requirements because the public had no opportunity to comment

on the final version of the ordinance stating in the general mapping section that critical areas maps would be online GIS maps that City staff could update regularly. He argued the Board was required to remand the ordinance for the City to allow additional public comments. Munce also argued that the use of GIS maps violated public participation requirements because City staff could update critical area maps without public comment or input.

The City responded that the edit to the general mapping language was a correction to bring the general mapping section in-line with the specific sections about each type of critical area, which had each referred to GIS maps throughout multiple drafts subject to public comment periods. "Reading the ordinance in its entirety, it is clear that the change cited by Petitioner was merely a cleanup for consistency and that the public had ample opportunity to comment on the change in wetland mapping methodology." AR at 7169. And the City explained that it had switched to GIS maps, "because the former maps were less accessible to the public, were generally out of date because they were updated infrequently, and did not show the level of interaction between critical areas and other map features, such as public and private existing infrastructure, lot lines, stormwater facilities, etc." AR at 7163.

The Board considered the history of public comments on the various drafts of the ordinance. It noted that the City adopted the ordinance "after over four years, 12 planning commission meetings, ten City Council meetings, two public hearings, and over 100 public comments." AR at 7263.

Next, the Board considered the language in the drafts that explained that each type of critical area would be mapped through GIS. The Board found "that the change to the method for updating maps was within the scope of alternatives available for public comment" and therefore

did not violate GMA's public participation requirements. AR at 7265. "A member of the public would hardly have been surprised by or foreclosed from commenting on the fact that [the final ordinance] allowed the City to make changes to the Critical Areas Maps 'as new environmental information related to critical areas bec[ame] available,'" because "this language was proposed as early as July 20, 2017." AR at 7266-67. And the new language in the general section about using GIS maps "was apparently added solely for clarification and to ensure that [the general section] was consistent with the language in [the sections for each type of critical area] regarding GIS mapping." AR at 7267. The Board; therefore, denied Munce's motion.

B.      Briefing on the Merits

1.      Arguments

In his briefing on the merits, Munce argued that the new ordinance violated the GMA and comprehensive plan in several ways. First, he contended that the City had to include an adaptive management program in the new ordinance. He also asserted that the City had failed to enforce its prior adaptive management program, and that this failure was itself a violation of the GMA. The City responded that it was "not required to include adaptive management in its critical areas ordinance because the City based its ordinance on a very thorough review of best available science." AR at 17142. The City explained that the GMA recommended an adaptive management program only "as an interim measure" for jurisdictions that did "not have best available science to rely on in adopting regulations." *Id.*; *see* former WAC 365-195-920(2). Because the City had incorporated the recommendations from the best available science reports, it had no reason or obligation to also implement an adaptive management program.

Munce next argued that the City violated the GMA's public participation mandates with the switch to GIS maps, because the maps could be adjusted "at any time without any identified standards and without an opportunity for public comment and legislative action." AR at 7276. He contended that the switch to GIS maps that could be updated without a public comment period, violated regulations requiring a precautionary approach when there was an absence of scientific information about local critical areas. The City responded that the GIS maps "integrate information from multiple sources to provide the most up-to-date maps that reflect real time conditions within the City" and that drafts of the ordinance mentioning the use of such maps had been available for public comment since 2017. AR at 17152.

Munce further asserted that the City had an obligation to allow members of the public to participate in enforcement actions under the ordinance by letting them "submit their own [best available science reports]" and "comment on the merits of the appeal." AR at 7280. He reasoned that members of the public should be able to appeal enforcement decisions to a hearing examiner, and that the lack of such a mechanism was "clearly erroneous" and inconsistent with the comprehensive plan. AR at 7281. The City responded that the new ordinance and other provisions of the municipal code allowed *interested parties* to appeal enforcement actions and other decisions. For example, permitting decisions under the new ordinance are land use decisions appealable under the Land Use Petition Act (LUPA), chapter 36.70C RCW. RCW 36.70C.020(2)(a). And anyone subject to an enforcement action under the new ordinance could appeal the administrative order to a hearing examiner. AMC 20.20.100(A)(1).

Munce also raised several arguments related to the City's alleged failure to enforce provisions of the prior critical areas ordinance or suggested language changes to the new

ordinance. He asserted that the City "failed to establish specific baseline dates from which to measure illegal activities and advance enforcement and restoration," and "failed to map and then advance monitoring and corrective action on wetlands identified in development projects since 1990." AR at 7272. He also contended that the City "effectively reward[ed] those who encroach[ed] on buffers with smaller buffers." *Id.*

2.      Board ruling and later proceedings

The Board issued a final decision and order. As an initial matter, the Board largely declined to consider arguments related to site-specific actions, enforcement of the prior ordinance, suggested edits to the new ordinance, or arguments that lacked citation to the GMA.[2] The Board explained, "[i]t is not enough for challengers to claim to the Board that the City could have adopted better protections." AR at 18539. Instead, a "[p]etitioner must establish that what was adopted was clearly erroneous after giving deference to the local [jurisdiction]." *Id.*

The Board then addressed the guidance around adaptive management programs. The relevant regulations provide that "[w]here there is an absence of valid scientific information or incomplete scientific information relating to a county's or city's critical areas," the jurisdiction should use "[a]s an interim approach, an effective adaptive management program that relies on scientific methods to evaluate how well regulatory and nonregulatory actions achieve their objectives." AR at 18516 (boldface omitted) (quoting former WAC 365-195-920(2)). Thus, if a jurisdiction followed the best available science "in adopting regulations, it [was] not required to

---

[2] Munce also argued that the City "reduced wetland protections by eliminating the City's long established Wetland District Approach." AR at 7279. The Board ruled that there was "no requirement within the GMA for a wetland district approach." AR at 18523. And Munce contended that the City had failed to include several wetlands in its maps, which were corrected before the Board issued its ruling. Munce appears to have abandoned these arguments on appeal.

adopt an adaptive management program." *Id*. The Board emphasized that the City had "shown that it worked closely with the Department of Ecology and its own consultants in identifying and relying on [best available science] in the update of its [ordinance]." *Id*. The Board concluded that Munce had not shown that the City lacked valid scientific information in drafting the new ordinance. Thus, he had not demonstrated that the new ordinance's lack of an adaptive management program violated any GMA requirement.

The Board also addressed Munce's argument that the switch to GIS maps violated the GMA's public participation requirements. The Board first observed that "[t]he GMA does not require that agencies even adopt maps of critical areas" because maps are "'too inexact for regulatory purposes,'" so jurisdictions "'should clearly state that maps showing known critical areas are only for information and illustrative purposes.'" AR at 18521 (quoting former WAC 365-190-080(4)(a), (b)). And while Munce had alleged a violation of the GMA's public participation mandates, "there [was] no citation to, nor argument presented, on the GMA's various public participation requirements." *Id*. Therefore, the Board found and concluded that Munce had not shown "that the City violated the public participation mandates of the GMA by failing to adopt a specific wetland map set." AR at 18522.

In addressing Munce's argument that the public should have standing to participate in enforcement actions, the Board began by stating that "there is nothing in the GMA nor in the [caselaw Munce cited] that creates an obligation to require participation or appeal rights to those not parties to the enforcement action." AR at 18525. And it noted that the critical areas ordinance as well as other chapters of the municipal code provided appeal rights for any party subject to an enforcement action. Thus, the Board found and concluded that Munce "failed to demonstrate the

existence of an obligation under the GMA to involve the public in City enforcement actions." AR at 18526.

The Board found and concluded that Munce had not demonstrated any violation of the GMA. Munce petitioned for judicial review of the Board's order. The trial court transferred the appeal directly to this court. Futurewise, a nonprofit corporation, filed an amicus brief in support of Munce.

ANALYSIS

I. PRINCIPLES GOVERNING REVIEW OF BOARD DECISIONS

Growth management hearings boards "have exclusive jurisdiction to review petitions alleging a [local government] did not comply with the GMA in adopting or amending its comprehensive plan or development regulations." *Spokane County v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 176 Wn. App. 555, 569, 309 P.3d 673 (2013); *see also* RCW 36.70A.280(1)(a). Boards reviewing local government decisions must afford the localities deference "in how they plan for growth, consistent with the requirements and goals of [the GMA]." RCW 36.70A.3201. While the GMA "requires local planning to take place within a framework of state goals and requirements, the ultimate burden and responsibility for planning, harmonizing the planning goals of [the GMA], and implementing a county's or city's future rests with that community." *Id.*

A city planning under the GMA has "broad discretion" to issue regulations "suited to its local circumstances." *King County. v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 142 Wn.2d 543, 561, 14 P.3d 133 (2000)). A board presumes that a city's development regulation is valid, and it is the petitioner's burden to demonstrate otherwise. RCW 36.70A.320(1). "The board shall find compliance unless it determines that the action by the . . . city is clearly erroneous in view of the

entire record before the board and in light of the goals and requirements of [the GMA]." RCW 36.70A.320(3). The board must defer to "local planning processes," and "where, within the constraints of the GMA, more than one appropriate planning choice exists, boards must defer to a [city's] discretion." *Kittitas County v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 172 Wn.2d 144, 155-56, 256 P.3d 1193 (2011).

The Administrative Procedure Act, chapter 34.05 RCW, governs judicial review of board actions. *Whatcom County v. Hirst*, 186 Wn.2d 648, 666, 381 P.3d 1 (2016). "The burden of demonstrating the invalidity of agency action is on the party asserting invalidity." RCW 34.05.570(1)(a). There are nine grounds for relief from a board's adjudicatory order. RCW 34.05.570(3). Relevant here, a court shall grant relief from a board's order if the court determines that the board "has erroneously interpreted or applied the law" or the order "is not supported by evidence that is substantial when viewed in light of the whole record before the court." RCW 34.05.570(3)(d)-(e). Courts review alleged misinterpretations of the law de novo. *Kittitas County*, 172 Wn.2d at 155. And courts review allegations that a board's order is not supported by substantial evidence by determining whether there is enough evidence "to persuade a fair-minded person of the truth or correctness of the order." *Thurston County v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 164 Wn.2d 329, 341, 190 P.3d 38 (2008) (internal quotation marks omitted) (quoting *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998)).

The GMA "is not to be liberally construed." *Id.* at 342. While a board must defer to the jurisdiction's "choices that are consistent with the GMA," the board "itself is entitled to deference in determining what the GMA requires." *Lewis County v. W. Wash, Growth Mgmt. Hr'gs Bd.*, 157

Wn.2d 488, 498, 139 P.3d 1096 (2006). Although we give "'substantial weight'" to a board's interpretation of the GMA, "the interpretation does not bind us." *Spokane County*, 176 Wn. App. at 565 (quoting *King County*, 142 Wn.2d at 553). "Overall, it is not a reviewing court's role to determine the correct planning decision; we review only whether the board's action was supported under the relevant standard of review." *Homeward Bound in Puyallup v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 23 Wn. App. 2d 875, 894, 517 P.3d 1098 (2022).

## II. CHALLENGES TO MAP REQUIREMENTS

A.       Public Participation Requirements

Munce argues that the Board erroneously interpreted or applied the law when it ruled that the City complied with the GMA's public participation requirements. He also contends that the Board's decision was not supported by substantial evidence. He asserts that the edits to the language of the ordinance made after the last public comment period were substantive changes that required an additional public comment period. Amicus points out that eliminating the requirement that the maps be adopted as part of the ordinance deprived the public of the opportunity to comment on how the maps should be drawn.

The City responds that the edits were "within the scope of alternatives available for public comment," so no new comment period was required to incorporate the edits. Br. of Resp't at 14. The City points out that numerous drafts referenced using GIS maps specifically for each type of critical area, and the change to the general section on mapping in the final ordinance "was merely a cleanup for consistency" that "the public had ample opportunity to comment on." *Id*. at 17.

As an initial matter, Munce appealed only the Board's final decision and order, not the preliminary order on public participation. But we will review a ruling not designated in the notice

of appeal if the "ruling prejudicially affects the decision designated in the notice" and the ruling was made before we accepted review. RAP 2.4(b). An order prejudicially affects a later ruling if "the order appealed from would not have happened but for the first order." *Right-Price Recreation, LLC v. Connells Prairie Cmty. Council*, 146 Wn.2d 370, 380, 46 P.3d 789 (2002). For example, an appellate court may review an order denying a motion to dismiss that would have terminated the action and precluded a later order that was properly appealed. *Id.* at 379. Here, if the Board had granted Munce's motion on public participation, it would never have proceeded to a hearing on the merits. Therefore, the order on public participation prejudicially affected the final decision and order, so we will review it.

RCW 36.70A.140 provides that every county and city planning under the GMA must have "procedures providing for early and continuous public participation in the development and amendment of comprehensive land use plans and development regulations." "Errors in exact compliance with the established program and procedures shall not render the . . . development regulations invalid if the spirit of the program and procedures is observed." *Id.*

There must be an opportunity for the public to comment on each major change to a document "before the local legislative body votes on the proposed change." RCW 36.70A.035(2)(a). However, "[a]n additional opportunity for public review and comment is not required" if the change "is within the scope of the alternatives [that were] available for public comment," corrects scriveners' errors, "or clarifies language of a proposed ordinance or resolution without changing its effect." RCW 36.70A.035(2)(b)(ii)-(iii). This court has held that amendments to a comprehensive plan map complied with the GMA's public participation requirements when the changes were either minor corrections or the substance of the change had been included in

prior drafts that the public had an opportunity to comment on. *Brinnon Grp. v. Jefferson County*, 159 Wn. App. 446, 473, 245 P.3d 789 (2011).

Here, the Board found that the City updated the ordinance after "12 planning commission meetings, ten City Council meetings, two public hearings, and over 100 public comments." AR at 7263. The Board found that the changes to the general mapping section were either available for public comment as early as 2017, or were clarifications to ensure the general mapping section was consistent with the new mapping protocol referenced in each of the sections about the specific types of critical areas. Thus, the Board concluded that "the change to the method for updating maps was within the scope of alternatives available for public comment" and did not violate GMA public participation requirements. AR at 7265.

Substantial evidence supports the Board's finding that the City began proposing using GIS to map the various critical areas in the 2017 draft ordinance. Every successive draft that received public comments included references to GIS mapping for each type of critical area. The challenged edit that occurred after the last public comment period deleted language in the general section about mapping that discussed certain maps being adopted by reference and added an explanation of where the public could find the GIS maps of critical areas. In short, the substance of the change had been included in prior drafts that the public had an opportunity to comment on. The challenged edit was a correction with no independent substance and made the general section consistent with the specific sections that had already been altered and that had been subject to public comment. *See Brinnon Grp.*, 159 Wn. App. at 473.

We hold that the Board did not erroneously interpret or apply the law when it concluded that the edit to the general mapping provision complied with the GMA's public participation requirements. And substantial evidence supported the Board's order on public participation.

B.      Best Available Science for Maps

Amicus Futurewise argues that the change to posting GIS maps online, where they could be updated without a public comment process, deprived the public of a chance to comment on the scope of critical areas reflected in the maps. Amicus asserts that the change was inconsistent with the best available science reports, pointing to the 2016 report recommendation that the City include maps referenced in the ordinance as appendices to the ordinance instead of to the comprehensive plan. And at oral argument, Munce explained that prior critical areas ordinances allowed public comment on changes to maps, while the current ordinance does not.

The City first responds that amicus raises a different argument than Munce did before the Board.[3] It also points out that when the 2016 report recommended attaching maps as appendices to the ordinance, that practice would have made the maps "more accessible to the public than an appendix to the comprehensive plan." Resp't's Answer to Amicus Curiae at 12. And the City emphasizes that "[w]ith GIS mapping, staff now have the ability to integrate information from project-specific critical areas reports into the online information accessible to the public." *Id.* at 6. Thus, the change to the mapping provision ultimately made the maps even more accessible than the 2016 report contemplated.

---

[3] Munce argues that the new ordinance "abandoned . . . the public's rights to challenge a wetland designation, or de-designation," but he does not contend on appeal that the change to using GIS maps was contradictory to the best available science. Pet'r's Br. at 25.

"Issues not raised before the agency may not be raised on appeal," except in limited circumstances. RCW 34.05.554(1). And we may decline to address arguments raised only by amici. *Bldg. Indus. Ass'n of Wash. v. McCarthy*, 152 Wn. App. 720, 749, 218 P.3d 196 (2009). However, Munce argued before the Board that the City acted inconsistently with regulations requiring a precautionary approach in the absence of best available science "by failing to adopt a specific wetland map set" and instead using the GIS maps that staff could update easily. AR at 7276. Thus, amicus' argument was within the scope of issues raised before the Board. However, their argument fails.

First, we note that the City's critical areas maps have for decades been reflective of critical areas established by experts. The new ordinance continues to require expert field investigations to determine the boundaries of critical areas. *See* AR at 45 ("The exact location of a wetland's boundary must be determined through the performance of a field investigation by a qualified professional."). And the City explained at oral argument that the current maps incorporate the data layers from the maps that were adopted under the prior ordinance and other official maps from agencies with critical areas expertise. *See* AR at 66-67 (listing fish and wildlife habitat maps that the new ordinance incorporated by reference). Additionally, because critical area designations are land use decisions, impacted interested parties can challenge critical area designations under LUPA. RCW 36.70C.060(1)-(2) (addressing standing under LUPA).

The change to using GIS maps was not a departure from the best available science. The 2016 report recommended attaching maps as appendices to the ordinance to make the maps more accessible to the public. The shift to posting the maps online makes the maps even more accessible than they would be if attached to the critical areas ordinance or the comprehensive plan.

Significantly, maps are not required elements of critical areas regulations because they are "too inexact for regulatory purposes," so jurisdictions "should clearly state that maps showing known critical areas are only for information and illustrative purposes." Former WAC 365-190-080(4)(a), (b). In Anacortes, "[r]egardless of whether a critical area is shown on the Critical Areas Map, the actual presence or absence of the features defined in [the] code as critical areas will govern." AR at 15. Thus, the maps do not *define* critical areas, they merely *reflect* where critical areas have been determined to exist based on project-specific critical areas reports.

Further, at least one of the best available science reports recommended referring to GIS maps to update the city's critical areas maps. And the language of the new ordinance reflects that the maps are for reference purposes only. In sum, the City did not depart from the best available science by providing GIS maps to illustrate the approximate locations of critical areas.

III. ADAPTIVE MANAGEMENT AND ENFORCEMENT

Munce next contends that the new ordinance violates the GMA because it lacks provisions related to adaptive management and enforcement mechanisms allowing public involvement.

As an initial matter, Munce also maintains several arguments he made to the Board which were disregarded as outside the scope of the Board's review. Munce continues to argue that the City violated the GMA when it "failed to establish specific baseline dates from which to measure illegal activities and advance enforcement and restoration," "failed to map and then advance monitoring and corrective action on wetlands identified in development projects since 1990," and "effectively reward[ed] those who encroach on buffers." Pet'r's Br. at 27. The Board declined to consider Munce's arguments related to site-specific actions and enforcement of the prior ordinance because those claims were outside the scope of its review of the new critical areas ordinance. And

20

arguments that there was a better way to draft regulations did not constitute a showing that the ordinance was clearly erroneous.

The City's alleged failure to enforce a prior ordinance is not an issue that we can address when reviewing a board order on the validity of a current ordinance. Similarly, we do not consider whether there is a better way for a locality to draft an ordinance, only whether the adopted ordinance violates the GMA under the applicable standard of review. *Homeward Bound*, 23 Wn. App. 2d at 894. And challenges to site-specific zoning and land use decisions "should be brought by means of a LUPA petition in superior court." *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 179 n.1, 4 P.3d 123 (2000). Therefore, we need not reach Munce's arguments about enforcement of the prior ordinance, site-specific actions, and contentions about how to better draft the ordinance.

A.      Adaptive Management

Munce argues that the Board erroneously interpreted or applied the law when it ruled that the new ordinance did not violate any GMA requirements regarding adaptive management programs in wetland buffers around critical areas. He also contends that the Board's decision was not supported by substantial evidence. Munce relies on *Swinomish Indian Tribal Community v. Western Washington Growth Management Hearings Board*, 161 Wn.2d 415, 166 P.3d 1198 (2007), to assert that the City was required to include adaptive management provisions in the new ordinance but failed to do so. He also argues that "[t]he Board erred in not requiring the City to clearly establish a wetland net loss baseline date" for monitoring and enforcement purposes. Pet'r's Br. at 34. We disagree.

21

RCW 36.70A.172(1) provides that cities planning under the GMA "shall include the best available science in developing policies and development regulations to protect the functions and values of critical areas." "[A] valid scientific process" as required for a best available science review "is one that produces reliable information useful in understanding the consequences of a local government's regulatory decisions and in developing critical areas policies and development regulations that will be effective in protecting the functions and values of critical areas." Former WAC 365-195-905(5)(a) (2000). A jurisdiction may obtain best available science by consulting "with state and federal natural resources agencies and tribes," or "through its own efforts, with or without the assistance of qualified experts, and through state agency review and the [GMA's] required public participation process." Former WAC 365-195-910(1)-(2) (2000). Former WAC 365-195-920 (2000) addressed the scenario where there was not any, or only "incomplete scientific information," for a jurisdiction to rely on:

> Where there is an absence of valid scientific information or incomplete scientific information relating to a county's or city's critical areas, leading to uncertainty about which development and land uses could lead to harm of critical areas or uncertainty about the risk to critical area function of permitting development, counties and cities should use the following approach:
> (1) A "precautionary or a no risk approach," in which development and land use activities are strictly limited until the uncertainty is sufficiently resolved; and
> (2) As an interim approach, an effective adaptive management program that relies on scientific methods to evaluate how well regulatory and nonregulatory actions achieve their objectives.

Munce relies on *Swinomish* to argue that the City was required to include adaptive management in its critical areas ordinance. In that case, the Washington Supreme Court addressed several challenges to Skagit County's critical areas ordinance, including alleged deficiencies in the county's adaptive management program. 161 Wn.2d at 423. The court explained that "[w]hen a monitoring system detects newly discovered risks to critical areas from land use or development,

adaptive management is a process used to confront the scientific uncertainty surrounding them." *Id*. at 436. *Swinomish* provided that when there is no best available science to guide development regulations, "local governments must either be certain that their critical areas regulations will prevent harm or be prepared to recognize and respond effectively to any unforeseen harm that arises." *Id*.

*Swinomish* is distinguishable from this case because here, the City *did* have best available science to rely on. In addition to the three best available science reports commissioned in the years preceding the adoption of the ordinance, the City incorporated recommendations from the Department of Ecology's comments on the draft ordinance and guidance from agencies such as the Department of Natural Resources and the Army Corps of Engineers. Munce does not show "an absence of valid scientific information or incomplete scientific information" that would have required an interim adaptive management program. Former WAC 365-195-920. Under these circumstances, the City had no obligation to incorporate an adaptive management program into its critical areas ordinance.

Finally, Munce cites no GMA provision or best available science requirement for the City to include a universal baseline date for enforcement actions in the new ordinance. The closest thing to a requirement that he cites is former WAC 365-190-090(2) (2010), which provides, "[C]ounties and cities are *requested and encouraged* to make their actions consistent with the intent and goals of 'protection of wetlands,' . . . as they existed on September 1, 1990." (emphasis added). This request is not a binding requirement. Munce's belief that there was a better way to draft the ordinance does not constitute a reversible error by the Board under the applicable standards of review. *Homeward Bound*, 23 Wn. App. 2d at 894.

We hold that the Board did not err in finding and concluding that the new ordinance did not depart from the best available science regarding adaptive management programs and baseline dates for enforcement actions.

B.      Enforcement Discretion

Munce argues that the Board erroneously interpreted or applied the law when it ruled that the GMA did not require the City to allow public involvement in actions involving enforcement of the critical areas ordinance. He also contends that the Board's decision was not supported by substantial evidence. He asserts that the ordinance allows "a single City official" to "simply grant an appeal of an enforcement action" without review. Pet'r's Br. at 35. He contends that members of the public should be able "to submit their own [best available science] and to comment on the merits" of an enforcement action. Pet'r's Br. at 36. Munce reasons that such enforcement is required in part because the City has not "undertaken the annual monitoring" required by a previous version of the critical areas ordinance. Pet'r's Br. at 39. We disagree.

The new critical areas ordinance provides in part, "Any decision to approve, condition, or deny a development activity proposal or other activity based on the requirements of this chapter may be appealed according to, and as part of, the appeal procedure for the underlying permit or approval involved." AR at 43. And Title 20 AMC provides that "[a]ny person subject to an administrative order," including a stop-work order, can appeal that order to a hearing examiner. AMC 20.20.100(A)(1). Further, LUPA authorizes both development applicants and property owners subject to a land use decision, as well as any other "person aggrieved or adversely affected by the land use decision, or who would be aggrieved or adversely affected by a reversal or

modification of the land use decision," to appeal that decision to superior court. RCW 36.70C.060(2).

Munce relies on a case where Island County's critical areas ordinance permitted waiver of a requirement for a biological site assessment whenever the county's planning director "determine[d] that development impacts [would] be minor." *Whidbey Env't. Action Network v. W. Wash. Growth Mgmt. Hr'gs Bd.*, 14 Wn. App. 2d 514, 537, 471 P.3d 960 (2020). There was no "transparent process or criteria for making that [waiver] decision." *Id*. at 538. This court held that the board in that case erred by failing to overturn the waiver provision "because, unlike a long list of other counties, Island County ha[d] failed to provide any guidelines or parameters to ensure county officials . . . adequately protect[ed] critical areas when evaluating waivers." *Id*. In contrast, it is permissible for codes to "allow some discretion to rest with [local] officials to determine how to implement certain aspects of their critical areas ordinances," so long as the ordinances also provided "benchmarks so that discretion is not completely unfettered." *Id*. at 539.

Here, any party subject to an enforcement action or other administrative order can appeal to a hearing examiner. AMC 20.20.040(B), .100(A)(1). And "aggrieved or adversely affected" parties may appeal a land use decision, such as a critical area determination, in superior court. RCW 36.70C.060(2).

Munce challenges the fact that members of the public cannot independently appeal enforcement decisions. The Board concluded that nothing in the GMA or *Whidbey Environmental Action Network* required the City to give participation or appeal rights to people who did not have an interest in an enforcement action. And Munce cites no case or law granting members of the public the right to provide public comment on or appeal a critical area enforcement action. This

25

court remanded in *Whidbey Environmental Action Network* for the county to impose more detailed benchmarks on the planning director's discretion, but nothing in that case required the county to allow public comment or appeals. 14 Wn. App. 2d at 540-41. Further, Munce does not show how the City violated any provision of the GMA by assigning the responsibility of enforcing the critical areas ordinance to the planning director. *See id*. at 539. And as discussed above, Munce's assertion that prior versions of the ordinance were not enforced is not an issue that is properly before this court in his appeal of the current ordinance.

We hold that the Board did not erroneously interpret or apply the law when it ruled that the City had no obligation to allow the public to participate in enforcement actions.

CONCLUSION

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Glasgow, C.J.

We concur:

_____
Lee, J.

_____
Che, J.